[Civ. No. 8441. Second Appellate District, Division Two.—September 28, 1932.]

In the Matter of the Estate of M. A. HAMBURGER, Deceased. JENNIE HAMBURGER MARX, Appellant, v. D. A. HAMBURGER, as Executor, etc., et al., Respondents.

Joseph Scott, Theodore C. Heyl and Harry J. McClean for Appellant.

Mitchell, Silbergerg & Davis and Peery Price for Respondents.

STEPHENS, J., *pro tem.*—The decedent, M. A. Hamburger, sometimes known as Mose Hamburger, died in Los Angeles County October 29, 1930. A document in form a witnessed will, executed August 18, 1930, was in due time presented to the probate court as his last will and testament and without contest was admitted to probate as such. ■ Later, Jennie Hamburger Marx, a sister of decedent, instituted a contest in which she asked that the probate of said document be revoked, basing her action on two grounds, to wit: (1) that at the time the deceased executed the will in question he was not mentally competent to make a will; (2) that said will was procured to be executed under the undue influence of D. A. Hamburger and his wife, Katherine Hamburger. The case went to trial before the court with a jury, and at the conclusion of contestant's case a motion for nonsuit was made as to each cause of action on the ground that no evidence had been produced which would justify the cause being left to the jury for decision. The court granted the motion as to each cause and contestant appeals from the ruling.

The estate involved is large and substantial. The will was long and contained trust provisions. In reciting the facts necessary to a consideration of the case we quote in part from appellant's opening brief under the caption "Statement of the Evidence", adding thereto, as we think proper, and designating the same by use of brackets: "The deceased at the time of his death was 71 years old. He had been a well known merchant and for many years prior to his death had resided in Los Angeles, when he was not traveling. He was very active in business and in other matters, and until his last few years was a man of apparent robust health. [Decedent was a close associate in business with his brother, D. A. Hamburger, continuously for many years and up to the time of his death.] He was a bachelor and was survived by one brother and three sisters. One brother is married

and has three children, all living and mentioned in the will of the deceased. One of the sisters was never married; the other two were. . . . The contestant is the mother of Mrs. Florence Hellman, who is not mentioned in the will of the decedent; neither are her children. . . . There is no necessity of setting forth here any fact in the life of deceased preceding 1927. In that year he suffered a brain concussion in a fall from a streetcar. The accident had slight effect on the deceased at the time but did cause his memory to become poor and clouded his mentality. [This lasted two or three hours while he was in the receiving hospital, although he was conscious at all times. The police surgeon testified that concussions might be temporary or permanent, and that he knew nothing of the effect of the accident on Mr. Hamburger after he saw him at the hospital. There is testimony that Mr. Hamburger went out that night to a party.] In the spring of 1928 the deceased visited Palm Springs and while there suffered a stroke of paralysis or spasm of the arteries, coming from hardening of the arteries. [This thickened his speech, confused his mind and caused him to fumble in the use of his hands. He recovered rapidly and was removed within two weeks to Los Angeles in an ambulance. Before returning he had recovered so that his speech was clear, his mental faculties clear and normal and fumbling had practically disappeared.] During 1928 and 1929 deceased traveled to Europe and there took treatments for his heart trouble. [While there he was subject to emotional outbursts without normal cause.] In January, 1930, he sailed for the Orient, and while on this trip was ill. He returned in April and went to the home of his sister [Mrs. Nathan], where he remained convalescing from his illness. His condition improved for a time after his return, but in the early part of September one of his attending physicians believed his condition to be hopeless. During his illness from April to the date of his death Doctors Leland Potts Hawkins, Donald Jackson Frick and Dudley Fulton attended him. Dr. Dudley Fulton is dead.'' This closes the general statement.

There can be no possible question from the evidence that decedent was mentally able to make a testamentary disposition of his estate up to his return from the Orient in April of 1930. We shall therefore analyze the testimony concern-

ing his mental status subsequent to that date, always, of course, remembering the history to such time.

Dr. Fulton, who treated decedent prior to April of 1930, is dead, and we have only the testimony of Dr. Hawkins, a younger associate of Dr. Fulton, as to decedent's illness from that date to his death. His examination was brief and the cross-examination was strictly limited. Dr. Hawkins first called on decedent in April of 1930, because Dr. Fulton was away. His testimony as to Mr. Hamburger's illness was similar to that of Dr. Frick, but shorter. The treatment described by him was about the same as described by Dr. Frick. He testified that deceased was given a little less medicine in July than in May, and about the same in August as in July.

Dr. Donald Jackson Frick was called on the case April 22d and attended decedent practically every day to May 23d. According to his testimony the patient had a chronic degenerative condition of his heart muscles; some swelling of legs and feet; shortness of breath—not painful but distressing; treatment was codeine; some morphine for sleeping and shortness of breath; morphine was discontinued shortly; improved in May. Dr. Fulton returned and Dr. Frick was not called again until September 3d; thereafter called upon decedent September 3d, 4th, 6th, 8th, 10th and 13th; found patient back about same as in April; heart disease had progressed; resumed old treatment; patient had good and bad days; thought case hopeless. On cross-examination the witness said: "As far as I could see, at any time I saw him, he was mentally clear", and testified that the patient carried on conversations very well on various subjects; that morphine and other drugs for sleeping would be effective for from four to six hours; that the drugs given patient were not sufficient to have any effect upon the mentality other than the effect of producing sleep.

Mrs. Florence M. Hellman is a daughter of decedent's sister, Mrs. Marx, the contestant herein, and is the mother of three children. She testified that decedent looked bad upon his return from the Orient; that she went to Europe six weeks later, returning early in August of 1930, from which time on she saw decedent often until his death; that he had failed during her absence; that he habitually lay back with eyes closed, trying to listen to what was said; would very

often doze off regardless of who was in the room, occasionally making a remark; that her children would come in several times each week and his eyes would beam and he would say, "Hello sweetheart"; that when not in pain he would seem to be interested and would listen to her narrative of European travels; that at a birthday party at the Nathans for Mrs. Marx and decedent on August 28, 1930, decedent came to dinner not fully dressed; ate little, talked little and was affected to tears by presents given him; the dinner lasted from 7 to 10 P. M., but decedent did not remain continuously at the table; that moving pictures were shown but he could not enjoy them; that after that he never got up and dressed but would lie propped up in bed by pillows, suffering and dozing off; that he would get short of breath, groan, grab the foot of the bed and sway until relieved; that in September he sometimes would make remarks apropos of the conversation; that at times he would try reading a paper, then fall back, close his eyes and the paper would fall. In October the witness' visits were fewer and of shorter duration.

The testimony of Mrs. Marx was essentially the same as that of Mrs. Hellman. She testified that after August decedent was given hypodermic injections quite frequently—during September once or twice a day; that he did not talk much, but smoked; that in October he grew worse—had attacks "continually all the time"; that she saw him every day in October; that he may have been conscious but was dozing most of the time; that he was not conscious his last week.

Mr. Isi Klingenstein, a friend and relative by marriage testified that after the oriental trip decedent seemed sleepy and drowsy most of the time—would fall asleep; that he saw him every three or four days; that he got weaker during August; that he "always talked to him, tried to talk to him"; that in September he was getting worse: "He couldn't leave the house; just several days he was feeling good and the next day he was sick again."

Louis J. Friedman testified that D. A. Hamburger told him in May of 1930 that "Mose is under the influence or spell of opiates and he is suffering all the time. Mose is going down hill very fast. We have given him dope day and night." In June decedent had a wild look in his eyes;

he was shrunken. "He didn't appear to be as rational. Dave said, 'He is going down hill very fast'." The witness at that time was in decedent's room about two minutes.

About two months before decedent died a former chauffeur of his was called in to help move him in a wheel-chair and decedent failed to recognize him and got excited.

Miss Evelyn Hamburger, youngest sister of decedent, testified that she received a message in Europe in June, 1930, signed "Brother", saying, "Come home if you wish to see your brother alive"; that she arrived home July 1st and saw decedent that evening; that he was emaciated and very weak; that he talked of Europe and various things; that he said, "I feel pretty good"; that she saw him every day in July; that "he would get up for a few hours"; that she stayed with him from morning until afternoon and then in the evening; that decedent went down town in July but that she tried to prevail upon him not to go because he was very weak; that he wanted to talk but the doctors discouraged it; that he was not improving in August but grew weaker— slept a good deal; he went down town on August 28th, his birthday, and sat at the dinner table awhile; "Oh, I don't know that he went down [town] very much in August, because it was very warm, and we tried to prevail upon him not to go too much"; that in September the injections were more frequent—made him drowsy; that in October, three or four days before his death, decedent had hallucinations; that in the beginning he was conscious quite a good deal, but later he dozed a good deal in the middle of the day; that he listened to the radio—stock market news and "Amos and Andy". On cross-examination the witness testified: "Q. Right up to pretty close to his death he was interested in those things, was he? A. I think so. He listened to sport events right up to close to his death. Q. Did he read the newspapers a lot? A. Toward the end he was unable to, and I used to say to him, 'Don't bother about the paper just now'. Q. Do you mean the last week or two? A. Yes. Mose went to Silberberg's office about August 1st and then Silberberg came to the house two or more times. Q. In fact, really, it wasn't until the very last couple of weeks that M. A. began to more or less lose interest in things; isn't that true? A. Yes. He had to be advised all along about being careful and not to go down town."

On the question of competency, D. A. Hamburger testified in a general way that decedent was interested in affairs generally and in business up to within a few days preceding his death.

Dr. Frank M. Mikels, a mental and nerve specialist, replied to a hypothetical question: ''Yes, in all reasonable certainty this man was of unsound mind.'' The doctor's testimony shows clearly that an ''unsoundness of mind'', as considered by him, was a technical term used to differentiate such a condition from a perfectly normal mind and was not at all the soundness of mind required of a person when executing a legal testamentary disposition of his worldly goods. The hypothetical question itself was indefinite in several important elements, including the extent of the concussion and paralysis, amount of medicines and how often given.

A hypothetical question was put to another medical expert, Dr. Samuel D. Ingham, who answered as follows: ''I would think that there was very definite impairment and disturbance with emotional reaction. I don't know how to answer in regard to whether he was of sound mind or not, because soundness of mind is a relative term. It would be my opinion that his mind was limited in its scope, in its capacity, and his emotional balance was disturbed so that his mind was not working at its greatest efficiency.''

The following quotation from the opinion in *Estate of Chevalier,* 157 Cal. 161, 170 [113 Pac. 130, 134], a case in which motion for nonsuit had been granted, is very pertinent: ''We are herein not unmindful of the testimony of the physician who declares under the prompting of a hypothetical question too long to be repeated, his belief that the deceased was insane. But this testimony goes no further than this. This court recently, in *Estate of Dolbeer,* 149 Cal. 227 [9 Ann. Cas. 795, 86 Pac. 695], was called upon to discuss the value of expert opinion evidence given under such circumstances, and declared it to be 'in the eye of the law of steadily decreasing value'. But giving to the evidence under the circumstances of the nonsuit, as we must, the fullest weight to which it is entitled, it is but a declaration of the belief of the physician that, from a medical standpoint, she was insane. It is not accompanied nor followed by any evidence showing the extent or nature of the insanity, and, as hereinbefore pointed out, the insanity,

which the physician believed he had found, could have well coexisted with full testamentary capacity." (See, also, *Estate of Purcell*, 164 Cal. 300, point 4 [128 Pac. 932], *Estate of Collins*, 174 Cal. 663, 670 [164 Pac. 1110], and *Estate of Flint*, 179 Cal. 552 [177 Pac. 451], holding that opinion evidence of unsoundness of mind rises no higher than the reasons given for the opinion.)

Much of the testimony above referred to was given to show a mental weakness on the part of decedent. Such testimony should be read in the light of the opinion in the recent case of *Estate of Bemmerly*, 110 Cal. App. 550 [294 Pac. 33]. In this connection, also, the following language from the opinion in *Estate of Casarotte*, 184 Cal. 73 [192 Pac. 1085, 1087], is pertinent: "It must be borne in mind that it is not every weakness and impairment of the faculties of the testator that will invalidate a will. Even where a testator is feeble in health, suffering under disease and aged and infirm, yet if he was of sufficiently sound mind to be capable of understanding the nature and situation of his property, and of disposing thereof intelligently, without any delusions affecting his action, he had sufficient capacity to make a will. It was held that the fact of the testator being unable to speak articulately and was compelled to communicate by signs did not raise a legal presumption of incompetency to make a will. (*Estate of Latour*, 140 Cal. 415 [73 Pac. 1070, 74 Pac. 441].)

Without here attempting to draw a fine technical definition of a nonsuit and without trying to harmonize the several leading cases upon the subject (and we confess that there are statements in the opinion in *Estate of Ivey*, 94 Cal. App. 576 [271 Pac. 559], with which we do not entirely agree), we think the following expresses the problem before us, in so far as the question of mental incapacity is concerned: Is there any substantial testimony that decedent was so mentally incapacitated on the eighteenth day of August, 1930, that he could not have understood the contents of the document which he signed on that day as his last will and testament? We think there is no such testimony. Decedent was an experienced business man and had drawn or executed several complicated wills. In this will he had the services of an attorney. He was a sick man, but he was able to converse and to take an interest in things through-

out August of 1930, the month in which the will was executed. He grew worse after August and yet he continued almost to his death to interest himself in many things. There is no evidence that the will was executed while decedent was under the influence of drugs. Furthermore, not every person who is given sedatives to comfort him in illness or opiates to induce a night's rest is necessarily incompetent to execute a will. (*Estate of Frazier*, 177 Cal. 266 [170 Pac. 601]; *Estate of Bemmerly, supra.*) The following words from *In re Ferguson's Estate*, 239 Mich. 616 [215 N. W. 51, 54], may well be applied to the instant case: "The technical wording of the will was the exercise of professional art by an attorney, and it was not at all essential that this testatrix comprehend the legal phraseology with the eye of a lawyer, but sufficient if she fully comprehended what was accomplished thereby. Few people understand the technical language of a deed, and were understanding of its technical words the test of mental competency of the grantor few deeds would stand. Underlying the words employed by the lawyer in the will is the simple meaning readily understandable by a layman."

It seems to us, also, that the evidence is entirely lacking as to the alleged undue influence of Mr. and Mrs. D. A. Hamburger. D. A. Hamburger was educated for, and many years ago did perhaps a little practicing, at the law. Assume that he did advise with his brother on former wills; assume that he did draw a will or a form of will for one of his relatives; that the will in question was more to his and his children's advantage than former wills of decedent; assume that the last will of decedent was more to the liking of D. A. Hamburger than the preceding wills of his brother; that it left to one of the sisters property for life only and did not mention grand nieces and nephews for whom decedent had shown much love and affection; assume that D. A. Hamburger was greatly displeased with the fact that decedent was going to change one of his former wills and that he had created a scene over it, and that this had been communicated to decedent; assume that D. A. Hamburger was present when the new will was executed, along with other witnesses; assuming all of this, and there is supporting evidence in the record, yet the evidence clearly shows that decedent was mentally competent on August 18, 1930, to

execute a will; that notwithstanding the fact that contestant and other witnesses were in the testator's company during his illness a much greater time than were the D. A. Hamburgers, no word or even a suspicion as to any undue influence by anybody had been produced. It seems to us that the evidence shows that the contestant entertained but a suspicion of undue influence, unfounded in fact so far as shown by the testimony produced. █ "Proof, to establish undue influence, must be had of a pressure which overpowers the mind and bears down the volition of the testator at the time the will is made. It consists in the exercise of acts or conduct by which the mind of testator is subjugated to the will of the person operating upon it (*Estate of Holloway,* 195 Cal. 711 [135 Pac. 1012]; *Estate of Anderson,* 185 Cal. 700 [198 Pac. 407]). █ Mere proof of opportunity to influence a testator's mind, even when coupled with an interest or motive to do so, will not sustain a finding of undue influence in the absence of testimony showing that there was a pressure operating directly on the testamentary act and to such an extent as to affect the terms of the testament. (*Estate of Fleming,* 199 Cal. 750 [151 Pac. 637]; *Estate of Bryson,* 191 Cal. 521 [217 Pac. 525].) █ It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence, but, before a will can be overthrown, the circumstances proved must be inconsistent with voluntary action on the part of the testator. (*Estate of Morcel,* 162 Cal. 188 [121 Pac. 733].)'' (*Estate of Donovan,* 114 Cal. App. 228 [299 Pac. 816]. See, also, *Estate of Presho,* 196 Cal. 639 [238 Pac. 944], and *Estate of McDevitt,* 95 Cal. 17 [30 Pac. 101].)

The entry of judgment for costs was not erroneous. The motion for nonsuit was properly granted.

Judgment affirmed.

Craig, Acting P. J., and Thompson (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 27, 1932, and an application by appellant to have the cause heard in the

Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 21, 1932.

Langdon, J., and Tyler, J., *pro tem.*, dissented.