[Civ. No. 17555. Second Dist., Div. One. Aug. 22, 1950.]

Estate of ARTHUR A. GREENHILL, Deceased. ADELLE L. GREENHILL et al., Respondents, v. ARTHUR F. GREENHILL et al., Appellants.

E. P. Mulholland and George W. Trammell for Appellants.

Perry & Bush, John R. A. Girling and Betty B. Gillette for Respondents.

WHITE, P. J.—Arthur A. Greenhill died testate April 8, 1949, at the age of 65. His attested will, dated April 7, 1949, provided for legacies of $10 each to his four children by first and second marriages, Arthur, Lorna, Joan, and Kenneth (contestants and appellants herein), and to two stepchildren by his fourth and last marriage, Kenneth and Naomi (legatees and respondents herein). The remainder of his estate was bequeathed and devised to his widow, Adelle (petitioner and respondent herein), whom he had married four and one half months prior to his death, and she was named as executrix.

The widow, Adelle Greenhill, petitioned for probate of the will, whereupon decedent's four children by previous marriages filed their grounds of opposition thereto contesting the validity of the execution and attestation of the will, the testamentary capacity of decedent, and alleging undue influence and fraudulent representations on the part of the widow. Of these, only two grounds of opposition were relied on at the trial: (1) That the will was executed under the undue influence of the widow, and (2) that it was executed at a time when the decedent lacked testamentary capacity. At the close of contestants' introduction of evidence, proponents' motion for nonsuit was granted and judgment accordingly entered granting said motion, admitting the will to probate, appointing the widow executrix, and ordering that letters testamentary be issued upon her taking the prescribed oath.

Upon this appeal contestants insist that they were entitled to have their case submitted to the jury on both of the grounds upon which the will was assailed. As to the first ground of undue influence, appellants set forth the well-established rule that where there exists a combination of three factors, namely, (1) a confidential relationship between the beneficiary and the testator, (2) undue profiting by the beneficiary under the will, and (3) actual and active participation by the beneficiary in procuring the execution of the will, a presumption of undue influence arises and the burden in on the beneficiary to show the will was not induced by his undue influence (citing

*Estate of Graves,* 202 Cal. 258 [259 P. 935].; *Estate of Lances,* 216 Cal. 397 [14 P.2d 768]; *Estate of Gallo,* 61 Cal.App. 163 [214 P. 496]; *Estate of Rabinowitz,* 58 Cal.App.2d 106 [135 P.2d 579]; *Estate of Johnson,* 31 Cal.App.2d 251 [87 P.2d 900]; *Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384]).

As to both the first ground of undue influence and the second ground of lack of testamentary capacity, appellants emphasize the necessity of applying the well-settled rules governing the dispositions of motions for nonsuits, quoting from the *Estate of Gallo,* 61 Cal.App. 163, at page 173 [214 P. 496] : ''In determining whether or not in a proceeding to contest a will, the evidence produced by the contestants is sufficient to require the submission of the case to the jury the same rules apply as in civil cases. Every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence produced must be considered as facts proved in favor of the contestants. Where evidence is fairly susceptible of two constructions, or if either of several inferences may reasonably be made, the court must take the view most favorable to the contestants. All the evidence in favor of the contestants must be taken as true, and if contradictory evidence has been given it must be disregarded. If there is any substantial evidence tending to prove in favor of the contestants all the facts necessary to make out their case, they are entitled to have the case go to the jury for a verdict on the merits. (Citing cases.)'' *Estate of Rabinowitz, supra,* which was an appeal from a judgment of nonsuit, states: '' . . . In other words, where different conclusions may be reasonably drawn by different minds from the same evidence, the decision must be left to the triers of fact. In determining the motion for a nonsuit the trial court was not authorized to, nor can this court on appeal, either weigh the evidence or pass upon the credibility of witnesses.''

But in applying these rules,. another consideration must be borne in mind, so aptly expressed by this court in the *Estate of Burns,* 26 Cal.App.2d 741, 748 [80 P.2d 77] : ''Reviewing the question of the sufficiency of the evidence to sustain the judgment of nonsuit in the light of settled and established legal principles, we are confronted first of all with the fact that every person of sound mind over the age of eighteen years may dispose of his separate property by will. (Prob. Code, sec. 20.) As was said in an especially well-considered opinion prepared by Mr. Presiding Justice Nourse of Division Two of the First Appellate District in the *Matter of the Estate*

*of Nolan*, 25 Cal.App.2d 738 [78 P.2d 456], 'the property of the testator is his to dispose of as he wills, and he is not called upon to consult or satisfy the wishes or views of juries or courts (citing cases); and "whether in the minds of others a will is just or unjust is a matter of opinion, and to permit a jury to determine the question without that substantial evidence which the law requires would be to permit a jury to make the disposition irrespective of the desires of a testator." (*Estate of Donovan*, 114 Cal.App. 228, 233 [299 P. 816].)' "

Bearing in mind the limitations of the above rules, the record discloses the following facts: Decedent lived at Redondo Beach in Los Angeles County and was a retired businessman deriving his income from his rental properties. He had four adult children by two previous marriages with whom he maintained friendly relations, and he visited at the home of his eldest daughter, appellant Lorna A. Callahan, on the average of once a week. He was very proud of his grandchildren and often presented them and his children with gifts, not however, constituting advancements.

The eldest daughter testified that during his third marriage, decedent suffered two or three heart attacks similar to the one from which his death ensued and his children were called to his "supposed death bed." Decedent became very "will conscious." In the words of his daughter:

"A. . . . We rather kidded about it. It was rather sort of his indoor sport. He always was having a will on the table. We weren't supposed to look at it, but we were supposed to look at it. It was just sort of a teaser. I think he just enjoyed us looking over what he had. If one of us looked, then we joked, 'You are out of the will,' then the other one would say, 'I was out last week, so we are even.' But dad seriously said, 'You kids will never starve because you are my kids, and I will see to it that you are taken care of.' He gave us that understanding.

"Q. How often did he make a will? Was it one a year or several a year, or what?

"A. Well, that is hard to say. He might have made six; he may have made a dozen; I don't know.

. . . . . . . . . . . . . . .

". . . he came to my house after Mrs. Greenhill, the third Mrs. Greenhill, died; and he said he would make a temporary will. Some day or other he was going to make one that would stick, I guess, but he had me make this will."

There was further testimony by the eldest daughter that the

previous wills made disposition of his estate to his four children and his grandchildren only. At one of his "supposed death beds" he told Lorna that she need not worry about the second mortgage on her home because he was going to see to it that it would be paid. There was discussion between the father and daughter about naming her as executrix of his estate. On January 21, 1948, she wrote to her father asking that she be relieved of the responsibilities attendant upon acting as executrix of his will because "the way you're bequeathing your property is so involved that I would never have a free minute for at least fifteen years after your demise." After expressing her appreciation for the confidence reposed in her by her father as well as for making her "one of your heirs." said daughter continued, "and if after reading this letter you decide to cut me out, that is all right, too. It is your money, and you have a perfect right to do what you want with it . . .

"In the meantime, come and see me as usual. You are welcome any time . . ."

Sometime in January, 1948, decedent met Adelle Greenhill, respondent widow herein. He saw her twice between January and July or August, 1948, visited her often thereafter, and they were married November 22, 1948. He continued his friendly visits with his children and his aforesaid wife often accompanied him.

On January 17, 1949, decedent retained Auten F. Bush as his attorney in an unlawful detainer action. The following month he visited his lawyer's office alone for the purpose of having a will drawn. Decedent instructed his attorney to draw the will so that respondent wife would receive all of his estate, subject to legacies of $10 to each of his children and each of the widow's children, but if she predeceased him, the estate was to be placed in trust for his grandchildren. Mr. Bush and his partner, Mr. Perry, proceeded to draw the will in accordance with the instructions given. On February 23d, Mr. Bush's secretary made a transcription of a telephone conversation she had with decedent wherein he dictated to her from a memorandum concerning a portion of his assets. Subsequently the memorandum in decedent's handwriting from which the foregoing transcription was made was delivered to Mr. Bush's office. Approximately two weeks after February 23d, both Mr. and Mrs. Greenhill visited Attorney Bush's office. By this time the will was ready for execution

except that the last page was not complete in that it lacked the dates of birth of the grandchildren. Mr. Bush related the contents of the will to both Mr. and Mrs. Greenhill and told Mr. Greenhill that he would have to insert the dates before the will could be completed. After this conference, Mr. Bush testified that he recalled talking to Mrs. Greenhill over the phone "pertaining to whether or not the will was ready," and "that she either called or I have talked to her on that." As to phone conversations with Mr. Greenhill, Attorney Bush testified:

"Q. Do you recall communicating with him subsequent to this second visit?

"A. I had a phone conversation with him. The last one that I can recall where—I don't know whether he called me or I called him; I don't know that; I believe he called me.

"Q. Approximately when was that?

"A. It was in the latter part of March, because at that conversation I asked him about those dates and told him that the will wouldn't be ready until we had those dates, and he made some remark, 'Well, I am not going to worry about that,' or something indicating that he wasn't going to be bothered right at the moment to supply the dates."

The will with the trust provisions was never completed or executed.

On April 7, 1949, at about 4 p.m., the decedent was stricken with a heart attack while playing cards at the Fortune Club in Gardena. Dr. Harry Breetwor, who was in the club at the time, testified:

"A. The man was cold, clammy, semiconscious, no pulse, blood pressure was hardly discernible; we gave him a third of a grain of pantopon, which is equivalent to about a quarter of a grain of morphine, intravenously, and gradually the pulse started to pick up; and he was able to talk at that time. I asked him if he had pain in his chest, and he put his hand on his chest here. I waited about ten or fifteen minutes, and I again questioned him. I said, 'Is that pain still pretty bad?' and he shook his head yes, and then I gave him another injection of the same, a third of a grain of pantopon, intravenously. He gradually improved, and his blood pressure gradually picked up; and we were all of this time trying to get his wife. In fact, I think the club contacted the wife, and his own private physician also was called by the wife, as I understand it; and they were on their way. The man, himself, supplied the information, even though we looked at his

identification to get his number; he did indicate the proper numbers to call. Then he gradually revived and improved, as far as blood pressure and pulse picked up.''

Dr. Breetwor testified that the effect of the sedative, pantopon, takes place immediately and wears off in about two hours. Decedent told Dr. Breetwor how to contact Mrs. Greenhill and suggested his choice of a hospital. He was conscious all of the time. The resuscitating squad from the sheriff's office arrived and administered oxygen. Mrs. Greenhill and the family physician arrived and accompanied decedent in an ambulance to the Harbor General Hospital in Torrance. At 5:45 p. m. decedent was admitted to the hospital ward on a stretcher, where Dr. Kassel, a resident physician, attended him.

Dr. Kassel started questioning the patient and then he ''stopped questioning the man because he appeared to be critically ill, and I felt that any added effort on his part might increase the possibility of a demise; and as long as his wife was there and she was able to give me an adequate story, I proceeded to question his wife.'' Dr. Kassel thought that the patient was under the effect of a narcotic, that he was critically ill, and that he had what was commonly known as a heart attack. The patient appeared to be suffering from pain and he also mentioned that he did have pain. Dr. Kassel felt the patient ''was sick enough and required a private room; and despite that they were being occupied I had the nurse remove one of the patients from a private room and substitute Mr. Greenhill there.''

Dr. Kassel was in attendance upon the testator for approximately one-half to three-quarters of an hour. During that time according to the physician, decedent ''may have spoken a few words'' to his wife. During this interval, according to the testimony of Dr. Kassel, respondent wife inquired ''if it would be possible to bring a lawyer so that Mr. Greenhill might sign his will, or make out his will.'' Dr. Kassel referred her to a nurse to make the telephone call asking the attorney to come to the hospital.

Because he was of the opinion that the testator might ''die at any minute'' Dr. Kassel placed him on what is known as the ''critical list.''

The physician prescribed quinidine, a preparation intended to ''cause the heart to quiet down so that it may return to a normal rhythm.'' According to his testimony, in order ''to

ease the pain and apprehension on the part of the patient,'' he ''also prescribed morphine, ordered the nurse to give him one dose medically, and then ordered her to give him doses subsequently, as required, on the part of the patient.'' In answer to a question as to how much morphine he ordered the nurse to give the patient, the physician testified: ''A quarter of a grain, medically, and then to continue that every three hours, as required by the patient, for the control of his pain.''

In describing the pain suffered by testator, Dr. Kassel testified, ''Well, it is described differently by individuals. I don't know whether you can call it pain. Many people describe it as an oppression from the chest as though they had a steel wire bound and being tightened, pressing their chest. Some authorities in medicine describe it as being, perhaps, the most severe pain that an individual can tolerate. Some people think it is a gnawing ache, some a sharp pain; it is described variously.''

The doctor then testified as follows:

''Q. Does that bring with it any premonition of death or feeling of imminence of death?

''A. Peculiarly, in this condition they say that the individual has an impending feeling of death. They get the feeling that they are going to die.''

Dr. Kassel also testified that he did not give testator a ''complete examination,'' that he ''thought he was very ill and the less done with him the better.'' Oxygen was ordered for the patient. Dr. Kassel was in attendance upon testator from 5:55 p.m. until 6:30 or 6:45 p.m. and returned again at 10:25 p.m. The physician testified that while he was with the testator the latter was fully awake and conscious and talked rationally insofar as the questions directed to him were concerned.

With reference to medication administered to testator the hospital nurse testified that at 6:30 p.m. the patient ''was given a quarter grain of morphine by hypo,'' and ''at 6:35 he was given three grains of quinidine, as ordered. At 7:00 he was transferred to a private room . . . At 8:00 he was resting quietly. At 9:00 he was given 300 milligrams of dicumarol, as ordered. And I have, color seems somewhat improved, pulse fair, with dozing at intervals. And at 11:00 he had three more grains of quinidine, as ordered, and that is all I have charted.''

With reference to the arrival of Attorney Bush and execution of the will, the aforesaid hospital nurse testified that respondent Mrs. Greenhill ''came to the office and she was

very upset, and she wanted to notify Mr. Bush.'' Because the telephones were located some considerable distance away the nurse volunteered that ''if she would give me the number I would get in touch with Mr. Bush for her.''

The nurse called Attorney Bush, advised him that Mr. Greenhill was in the hospital, ''that he was critically ill and that Mrs. Greenhill wanted to see him.'' The attorney advised that he ''would be down as soon as he could,'' which message was transmitted by the nurse to respondent Mrs. Greenhill.

The nurse also testified that prior to being moved into a private room, testator ''knew that he was in a county hospital, and he knew that he was out in the ward; and he didn't like it,'' and that ''he was more satisfied when he was in a private room.''

Coming now to the circumstances immediately surrounding the preparation and execution of the testamentary document in question, the record reflects that about 6:30 o'clock on the evening of April 7, 1949, Attorney Bush received a telephone call at his home from a then unidentified lady who said, ''This is the Harbor General Hospital, and we have a patient here by the name of Arthur A. Greenhill who has asked that you come over right away and bring the will which you have prepared.'' Mr. Bush asked Mr. Richardson, his dinner guest, to accompany him and the two of them drove to the hospital, stopping en route at Mr. Bush's office to pick up the incomplete will. They arrived at the hospital about 7 p.m. where the guard directed them to Ward C-9. Mr. Bush testified that Mr. Greenhill was lying in a hospital bed——

''. . . He was, as I recall it now they had part of the bed raised so he wasn't sitting up, but, I believe, he was at an angle there; his back was, maybe, at a fifteen- or twenty-degree angle from the floor. He had on an oxygen mask, and, well, when I came in he shook hands with me—just—I didn't offer my hand to him, he offered his to me, and I was careful not to grasp his hand, and he gave me a pretty firm grip. I don't mean to imply that it was a strong grip, but he gave me an ordinary grip, which impressed me at the time; with that mask on there, and, of course, anything like that gave me the impression that the man must be sick.

''. . . when I first went in there, I asked him, 'What are you doing here, and what is the matter?' And he said he had had a heart attack, and then he told me, he said, 'I was

over at the Fortune Club playing cards, and I had two 2's and two aces and drew the third ace, and it was too much for me.' And he was kind of joking about it, jovial; he didn't—I guess—excuse me. He appeared to be regarding it in a humorous manner, the incident."

The attorney testified that Mr. Greenhill asked him if he had the will and he answered, "I have it, but it is not completed because, as you know, we have never had the dates of the births of the grandchildren. . . . But I can redraft the will that everything goes to Mrs. Greenhill. You won't need the trust anyway; this is really an emergency." Mr. Greenhill told him to "go ahead and draw it up."

During this conversation, Mr. Richardson was standing in the doorway of the room and Mr. Bush asked him to come in, introduced him to Mr. Greenhill and they shook hands in a firm handshake. Mr. Richardson testified that Mr. Greenhill had on an oxygen mask that he took on and off. Mr. Bush and Mr. Richardson then left and went down to one of the nurse's offices where Mr. Bush prepared the will. Mr. Bush copied the previously prepared will in longhand, omitting the trust provisions, and in doing so, pointed out to both the nurse and Mr. Richardson that he was copying the previously prepared will. He and Mr. Richardson then returned to Mr. Greenhill's room. Mrs. Greenhill either entered the room before them or right after them. Mr. Bush asked Mr. Greenhill if he wished to read the will and Mr. Greenhill requested Mr. Bush to read it to him, which he did. Mr. Bush asked Mr. Greenhill if that was the way he wished the will and Mr. Greenhill "said words to the effect that yes, it was that he wanted to leave everything to his wife, and that the last six or eight months of his life, apparently the length of time that he had been married or known Mrs. Greenhill, had been the happiest of his life. . . .

". . . I had been standing toward the foot of the bed, and as he was asked to sign the will—Mrs. Greenhill at that time had entered the room, and she made a move toward him—and he said, 'No,' he said, 'I want this young man'—or something to that effect—'at the end of the bed,' and he pointed to me to hold him up while he signed it; and I stepped over there and put my arm around him and held him up into a sitting position, and he signed it with the papers on his lap."

At Mr. Bush's suggestion, Mr. Greenhill also initialled the first page of the will. During the second visit to the room, Mr. Richardson testified that the patient appeared alert, that

he was coughing or was nauseated and that he had a little pan into which he regurgitated.

According to the testimony of both Mr. Bush and Mr. Richardson the will was executed with the proper formalities. Mr. Greenhill died at 1:58 p.m. the following day.

The record further discloses that the hospital nurse testified that while Attorney Bush and his friend and attesting witness, Mr. Richardson, were in the room the nurse entered to ask testator "if he was still nauseated, and how he felt . . . He said he felt better. I asked him if he was having any pain, and he told me no."

On the basis of this evidence, appellants contend that they were entitled to have the issues of lack of testamentary capacity and undue influence submitted to the jury.

Inasmuch as undue influence is said to presuppose testamentary responsibility or competency, and to require it as essential to the existence of undue influence (1 Page on Wills (3d ed. 1941) § 185, p. 369; 26 Cal.Jur. 642), the issue of competency will be considered first. Appellants emphasize that when Mr. Greenhill signed the purported will:

(1) he was on the "critical list" when death was expected any moment;

(2) he had been placed in a private room from whence another patient had been removed expressly for the accommodation of decedent;

(3) just two hours before the will in question was signed the house physician ceased his preliminary questioning of the decedent because, in his opinion, any further questioning of the decedent might result in his death;

(4) he was not able to breathe sufficiently unless he had an oxygen mask;

(5) shortly after his heart attack at the Fortune Club, Dr. Breetwor gave him a third of a grain of pantopon; at 6:30 p.m. the nurse at the hospital gave him a quarter grain of morphine, and at 6:35 p.m., she gave him three grains of quinidine.

(6) at exactly 7 p. m., according to the hospital nurse and the hospital charts, the decedent was in pain and was nauseated.

In the *Estate of Llewellyn,* 83 Cal.App.2d 534 [189 P.2d 822, 191 P.2d 419], this court held that a verdict should have been directed in favor of the proponent of the will, and reversed the judgment. (The right of the trial court to direct a verdict in a will contest is the same as its right to grant

a nonsuit. *Estate of Bemmerly,* 110 Cal.App. 550 [294 P. 33].)
In the Llewellyn case, this court said: "The presumption
always is that a person was of 'sound mind' at the time of the
execution of his will, and the burden therefore always rests
upon the contestants to show affirmatively, and by a pre-
ponderance of the evidence, the incapacity of the testator,
and the further fact that except for alleged infirmities of mind
or body, he bequeathed his property in a manner that he
otherwise would not have done.

"Giving a consideration to all of the foregoing evidence
introduced by contestants and respondents, we must hold
that it falls far short of constituting what the law regards
as a rebuttal of the presumption of testamentary capacity at
the time of the execution of the will, the existence of which
is destroyed only when by *substantial* evidence it is shown
that a testator was unable to understand and carry in his
mind the nature and situation of his property, his relations to
his relatives and those around him, incapable of understanding
the act he is performing, and the relation in which he stands
to the objects of his bounty if any.''

▮ The claimed infirmities of mind or body must be shown
to have had a direct bearing upon the testamentary act.
(*Estate of Russell,* 80 Cal.App.2d 711 [182 P.2d 318].)

▮ While the factors stressed by appellants are material in
ascertaining the effect of the influence alleged to have been
exerted, considering the physical and mental condition of the
testator, they fall far short of constituting a rebuttal of the
presumption of testamentary capacity. There was no evidence
presented showing any irrationality on the part of the testator
or that he was not conscious of his surroundings and his acts
either before or during the time of the execution of his will.
This total lack of evidence plus the fact that the executed will
contained essentially the same provisions as a previously pre-
pared will left the trial court with no alternative other than
to grant a nonsuit as to the issue of lack of testamentary
capacity.

As to the issue of undue influence, appellants claim a prima
facie showing of the three factors constituting a presumption
of undue influence: (1) a confidential relationship between
respondent wife and testator; (2) undue profit by respondent
wife under the will; and (3) activity on the part of re-
spondent wife in procuring the execution of the will. As to
the first factor, appellants rely solely upon the relationship
of husband and wife, citing *Estate of Teel,* 25 Cal.2d 520

[154 P.2d 384]: "A fiduciary relationship exists between husband and wife in respect to the issue of undue influence in a will contest, and where such fiduciary relationship is combined with unduly profiting by the will, and its being unnatural, and activity on the part of the proponent in procuring its execution, we have persuasive evidence of undue influence." Conceding a confidential relationship based solely on the husband and wife relationship, activity on the part of respondent in procuring execution of the will must be shown to raise a presumption of undue influence. The appellants set forth the following facts as evidence of such activity:

(1) Sometime after February, 1948, respondent wife called Bush, the attorney, twice to inquire whether the will was completed;

(2) Respondent wife on one occasion called at Mr. Bush's office with the decedent in reference to the preparation of the will;

(3) After Dr. Kassel, the resident physician at the Harbor General Hospital, had completed his first examination of Mr. Greenhill, respondent wife approached the doctor and inquired if it would be possible to bring in a lawyer to make his will;

(4) After this conversation with Dr. Kassel, respondent wife went to the nurse and procured her to call the attorney and request that he come to the hospital to make the will;

(5) Respondent wife was in the decedent's room throughout the time that the will, as prepared by the attorney at the hospital, was read to the testator and when it was executed by him.

In the Estate of Lewellyn, *supra*, with reference to activity on the part of the person charged with exercising undue influence, this court stated at page 565: "In the instant case the evidence conclusively shows that the will was prepared from directions given by the testator to his attorney and there is very strong evidence that it was the testator's voluntary act (*Estate of Fraser*, 75 Cal.App.2d 99, 104 [170 P.2d 704].) The evidence in the case at bar of activity on the part of appellant is far more lacking in substantiality than that present in *Estate of Hamburger*, 126 Cal.App. 455, 463, 464 [14 P.2d 802], wherein it was held that a motion for nonsuit was properly granted. In the case now engaging our attention, nothing more was shown than the presence of an opportunity for appellant to influence the testator's mind with a possible

interest or motive so to do. This is totally insufficient. Before a testamentary document will be overthrown because of the exercise of undue influence, the proven circumstances must be inconsistent with voluntary action on the part of the testator.''

In the *Estate of Burns,* 26 Cal.App.2d 741, 750 [80 P.2d 77], wherein a judgment of nonsuit was affirmed, this court said: "There is nothing in the record before us inconsistent with the idea that the testatrix executed the will here in controversy without any previous suggestion of such action by anyone, and entirely of her own free will, without influence or coercion of any kind. The burden was on the contestants to show the contrary, and it is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence, but before a will can be overthrown, the circumstances must be inconsistent with voluntary action on the part of the testatrix. (*Estate of Morcel,* 162 Cal. 188 [121 P. 733] ; *Estate of Donovan,* 114 Cal.App. 228 [299 P. 816]. See, also, *Estate of Presho,* 196 Cal. 639 [238 P. 944], and *Estate of McDevitt, supra.*) The evidence in this case, when weighed by the standard here enunciated, falls far short of showing any such undue influence as in effect destroyed the testatrix' free agency and overwhelmed her volition at the time of making the will with which we are here concerned.''

The five instances of activity on the part of the respondent wife set forth by appellants herein fall far short of sufficient evidence to warrant determination of the issue of undue influence by a jury.

For support of the statement just made it becomes necessary to do no more than cite the following cases, in which the evidence was much stronger than appears in the instant case, and yet was held insufficient to justify the setting aside of the testamentary documents there under consideration: *Estate of Perkins,* 195 Cal. 699 [235 P. 45] ; *Estate of Clark,* 170 Cal. 418 [149 P. 828] ; *Estate of Purcell,* 164 Cal. 300 [128 P. 932] ; *Estate of Casarotti,* 184 Cal. 73 [192 P. 1085] ; *Estate of Finkler,* 3 Cal.2d 584 [46 P.2d 149] ; *Estate of Garvey,* 38 Cal.App.2d 449 [101 P.2d 551].

In the case at bar we fail to perceive any substantial evidence that pressure was brought to bear by respondent widow directly upon the testamentary act, and it is the law that such evidence must be produced. (*Estate of Arnold,* 16 Cal.2d 573, 577 [107 P.2d 25] ; *Estate of Carithers,* 156 Cal. 422, 428 [105 P. 127] ; *Estate of Gleason,* 164 Cal. 756, 765 [130 P. 872]). Conceding that the evidence herein is

sufficient to show that respondent wife was so situated as to have an opportunity to unduly influence the mind of the testator, or that the actions and conduct of the said respondent might be regarded as suspicious, such evidence is insufficient to support a finding of undue influence. There is a presumption that one is innocent of crime or wrongdoing (Code Civ. Proc., § 1963, subd. 1). The declarations of testator that he intended to ''take care'' of appellants were admissible only to show the relations between them and the state of the testator's mind with reference to his children. Securing an attorney to draw a will for another has been held not to constitute participation (*Estate of Hull*, 63 Cal.App.2d 135, 139, 142 [146 P.2d 242]). In the instant case the evidence conclusively shows that Attorney Bush was testator's attorney, selected originally by him, represented him in other litigation, and had, as heretofore noted, prepared a previous will for him. In *Estate of Hamburger*, 126 Cal.App. 455, 463, 464 [14 P.2d 802], wherein it was held that a motion for nonsuit was properly granted, the evidence of activity was much stronger in substantiality than is present in the case now engaging our attention.

Appellants also claim the trial court erred in refusing to admit evidence showing the value of the estate to be received by the widow. In view of the fact that a nonsuit should have been granted in the trial court on the issue of undue influence because of lack of evidence as to activity on the part of the respondent widow, the trial court's ruling on admissibility of this evidence is of little consequence and certainly not prejudicial.

The attempted appeals from the order or decree granting motion for nonsuit, the order or decree admitting will to probate, and the order or decree granting letters testamentary are, and each is, dismissed for the reason that in the instant case such orders and decrees are reviewable on an appeal from the judgment entered thereon. The judgment is affirmed.

Drapeau, J., concurred.

Doran, J., dissented.

Appellants' petition for a hearing by the Supreme Court was denied October 19, 1950. Carter, J., voted for a hearing.