[L. A. 22681.   In Bank.   July 2, 1954.]

Estate of MYRTLE F. WELCH, Deceased.   ARTHUR A. FAIRCHILD, Appellant, v. GERALDINE F. ADAMS, Respondent.

Robert A. Jarrott and LeRoy Thomas for Appellant.

Austin, Austin, Jones & Chaffee for Respondent.

SPENCE, J.—This is an appeal by proponent Arthur A. Fairchild from a judgment denying probate of a will and codicil.

Myrtle F. Welch died December 22, 1951. She was a widow at the time of death, her husband having died January 21, 1947. She had no children. Her heirs at law and next of kin were two brothers and a sister. By a will dated February 27, 1947, she left all her property to one brother, Arthur A. Fairchild; and by a codicil dated December 26, 1949, she

named him to serve as executor without bond. Arthur Fairchild presented the will and codicil for probate. Geraldine F. Adams, the sister of the deceased, contested their probate on the following grounds: (1) unsoundness of mind; (2) undue influence exerted by proponent; and (3) lack of due execution. At the trial following the proponent's prima facie showing of due execution of both the will and the codicil, the third ground of contest was dismissed on motion of the contestant. At the close of the contestant's case, the court granted proponent's motion for a nonsuit as to the first ground of contest, leaving for trial only the issue of undue influence. By a vote of 10 to 2 the jury found, in answer to special interrogatories, that both the will and the codicil were procured by the undue influence of the proponent. Judgment denying their probate was thereupon entered; and from such judgment proponent appeals.

Appellant contends that the evidence was insufficient to support the jury's finding of undue influence, and that the trial court committed prejudicial error in the giving and the refusal of certain instructions. It will be unnecessary to discuss this latter assignment of error, for it appears that appellant's contention that the evidence was insufficient to support the jury's finding must be sustained.

In *Estate of Arnold*, 16 Cal.2d 573, at page 577 [107 P.2d 25], the rules governing the determination of whether a testamentary instrument is the product of undue influence are stated as follows: ''In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. (*Estate of Motz*, 136 Cal. 558, 583 [69 P. 294].) Evidence must be produced that pressure was brought to bear directly upon the testamentary act. (*In re McDevitt*, 95 Cal. 17, 33 [30 P. 101].) Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will and must amount to *coercion* destroying free agency on the part of the testator. (*Estate of Keegan*, 139 Cal. 123, 127 [72 P. 828].) . . . mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. (*Estate of Easton*, 140 Cal.App. 367, 371 [35 P.2d 614].)

'' 'The unbroken rule in this' state is that courts must refuse to set aside the solemnly executed will of a deceased

person upon the ground of undue influence unless there be proof of "a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made." ' (*Estate of Gleason,* 164. Cal. 756, 765 [130 P. 872].)" See also *Estate of Carithers,* 156 Cal. 422, 428 [105 P. 127]; *Estate of Lingenfelter,* 38 Cal.2d 571, 586-587 [241 P.2d 990]; *Estate of Spaulding,* 83 Cal.App.2d 15, 19-20 [187 P.2d 889]; *Estate of Llewellyn,* 83 Cal.App.2d 534, 563-564 [189 P.2d 822, 191 P.2d 419]; *Estate of Greenhill,* 99 Cal.App.2d 155, 168 [221 P.2d 310]; *Estate of Williams,* 99 Cal.App.2d 302, 310 [221 P.2d 714]; *Estate of Dobrzensky,* 105 Cal.App.2d 134, 143 [232 P.2d 886]. In the light of these settled principles, the evidence viewed most favorably to contestant must be examined.

The testatrix Myrtle, her husband, and her brother Arthur had lived together for a number of years. Arthur was a prospecting mining engineer, and his work took him out of town for weeks at a time. When Myrtle's husband died January 21, 1947, Arthur was not living with them. Myrtle's sister Geraldine made the funeral arrangements. In accordance with Myrtle's wishes, Arthur was not notified of the death until two or three days after the funeral. Meanwhile Myrtle and Geraldine decided that Myrtle should sell her home in Compton and live with Geraldine in Long Beach. Myrtle listed her home for sale with a real estate broker. Each of the sisters then made a handwritten will dated January 28, 1947. Geraldine thereby gave Myrtle the use of her house (not exclusively) for life, with the residue of the estate to go to one of Geraldine's sons. Myrtle left to Geraldine all of her property excepting $6,500, which sum Geraldine was to hold as trustee for Arthur. Both Myrtle and Arthur had received $6,500 from their parents' estate, and thereafter, as they made successive wills over the years, each always bequeathed to the other this amount of family inheritance.

About February 1, 1947, while the two sisters were packing Myrtle's belongings to move to Geraldine's home, Arthur appeared at Myrtle's house in response to Myrtle's letter. Geraldine testified that she saw the letter before it was mailed, and that in it Myrtle asked Arthur to come and take his things out of the garage. Arthur testified that he had long before taken all his belongings from the garage, and that Myrtle had simply written to ask him to come to her at that trying time following her husband's death. The letter was not produced at the trial. Immediately upon Arthur's arrival,

a heated discussion developed. Geraldine testified that "the first thing" Arthur said was "Myrtle, now that Fred is gone, you will have to make out a new will, and if you will everything you have to me, I will will everything I have to you." Arthur pleaded with Myrtle to stay where she was and make a home for him. Geraldine had a tantrum. Myrtle and Arthur then went for a ride in his car. When they returned, Arthur told Geraldine "Take your things and get out of here. I am going to stay with Myrtle." Then Arthur and Geraldine began to argue, whereupon Myrtle beckoned Geraldine to come into the yard and Myrtle said: "I have stood all I can stand of fighting. You will just have to do as he says . . . I will stay here until he gets his things out of the garage, then I will ease him out without fighting."

Thereafter Myrtle and Arthur lived together in Myrtle's home until Myrtle died. The real estate listing was cancelled; and within a few weeks after Arthur's return, Myrtle and Arthur made new wills. Myrtle made the will here involved on February 28, 1947. She thereby left all her property to Arthur. Its approximate value was $18,000. At that time she was 68 years old. Arthur's will left to Myrtle $25,000, part cash and part mining claims of speculative value but apparently all that he had. Then almost two years later and on December 26, 1949, when Myrtle was 70 years old, Myrtle made the codicil here involved naming Arthur executor. At the same time Arthur named Myrtle to act as executrix of his will. No one except Myrtle and Arthur was present when the wills and codicils were executed.

Myrtle was of a mild disposition and tried to avoid quarrels with Arthur. There were disputes with the relatives over the prevailing home arrangements between Myrtle and Arthur, and Arthur systematically excluded Geraldine and her sons from the house. However, Myrtle surreptitiously visited Geraldine in Long Beach when Arthur was away on his frequent mining trips. There was testimony that about two weeks before Myrtle died, Arthur arranged with a mortician for an inexpensive burial service for her rather than the usual funeral; that despite Myrtle's illness of some weeks, Arthur did not summon a doctor until a few hours before Myrtle died; that the mortician found Myrtle's body filthy and emaciated in an unkempt bed; and that when the relatives heard of Myrtle's death, they arranged a proper funeral for her at their own expense, which funeral Arthur did not attend.

Upon this evidence the jury found that Myrtle's proposed will and codicil were the result of the undue influence of Arthur. Motions for judgment notwithstanding the verdict and for new trial were denied. Arthur appeals from the judgment entered on the verdict. He properly maintains that the evidence upon which the jury determined that the disposition which Myrtle made of her property by her will and codicil should be set aside falls far short of the requirements relating to the showing of undue influence under the established rules.

It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence; but before the will can be overthrown the circumstances must be *inconsistent* with voluntary action on the part of the testator. (*Estate of Donovan,* 114 Cal.App. 228, 233 [299 P. 816].) Arthur, in living alone with Myrtle, may have had the opportunity to unduly influence her but there was no evidence produced by the contestant so bearing upon the testamentary act or anything indicating coercion or lack of free agency on the part of Myrtle when she executed the will.

The heated discussion among the relatives upon Arthur's appearance at Myrtle's home, when it was finally decided that he and Myrtle should live together, occurred about February 1 and more than three weeks elapsed before Myrtle made her will of February 27, 1947. While by that will Myrtle chose to make her brother Arthur her sole beneficiary to the exclusion of her sister Geraldine and certain nephews, such testamentary act does not appear to stem from a confidential relationship existing between Arthur and Myrtle. Rather, the evidence adduced by contestant was all to the contrary, affirmatively and effectively establishing considerable quarreling and bickering among the relatives and Myrtle's attempt to keep peace by not provoking any unnecessary arguments.

Consanguinity of itself does not create a fiduciary relationship. (*Estate of Llewellyn, supra,* 83 Cal.App.2d 534, 562.) Myrtle's mental and physical condition was not shown to have been such as to permit a subversion of her freedom of will or to negate her independent management of her own affairs. On the contrary, so far as appears from the record, Myrtle was at all times a clear thinking, deliberate woman, aware of her property holdings and financial situation, and it was not until a few days before her death that her general condition deteriorated.

There was no evidence that Myrtle at any time after

making the will expressed any testamentary intentions at variance therewith. ■ While she thereby preferred one relative, her brother Arthur, as beneficiary to other relatives, her sister Geraldine or nephews, such discrimination did not make the will unnatural. (*Estate* of *Llewellyn, supra,* 83 Cal. App.2d 534, 566; see also *Estate of Arnold, supra,* 16 Cal. 2d 573, 588.) Arthur as heir of Myrtle's estate valued at approximately $18,000 did not unduly profit from her will, for he had made his will leaving his property to her, $25,000 in cash and mining claims. He and Myrtle had discussed his mining interests, and she presumably was aware of their speculative nature and the basis of their valuation as a prospective inheritance. Arthur was absent on frequent mining trips for several weeks at a time, when Myrtle might have changed her will, and yet there was no evidence that she ever wished or undertook to do so. Rather, almost two years after execution of the will, Myrtle added a handwritten codicil to her handwritten will, on the same paper, merely appointing Arthur as executor. Manifestly the testamentary disposition of her property was then drawn to her attention, and yet Myrtle did not elect to make any change. ■ While Geraldine argues that Arthur's conduct upon moving into Myrtle's home following the death of Myrtle's husband operated to coerce Myrtle into making the will in question *over three weeks later,* there was no semblance of a showing of any pressure or overpowering activity on his part at or near the time of her execution of the codicil. The latter act had the effect of reexecution of the will and removed any possible taint of undue influence which might be argued with respect to its original procurement. (*Estate of Baird,* 176 Cal. 381, 385 [168 P. 561]; also anno. 21 A.L.R.2d 823, 831.)

Contestant cites the cases of *Estate of Snowball,* 157 Cal. 301 [107 P. 598], and *Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384], as authority for affirmance of the finding of undue influence here. But the facts of those cases clearly distinguish them from the present situation. In *Estate of Snowball* the contestant, a son of the testatrix, was practically disinherited by his aged mother, who was under the domination of her daughter and made the will in response to her daughter's continued importunities and in conformity with the latter's wishes. There was evidence of the testatrix' declaration of helpless submission to her daughter's control in the daughter's presence, which was not denied. Also false representations relative to the contestant's previous inheritance from his father's

will were shown to have been made by the daughter for the purpose of affecting the mother's disposition of her property by the will. In *Estate of Teel* the testatrix disinherited the contestant, her only daughter by a former marriage, and left all her property—most of which had been acquired from her former husband, the contestant's father, on his death—to her second husband, to whom the testatrix had been married but a few months and who was the proponent of the will in question. There was evidence that the testatrix had serious mental defects including a suicidal mania, and that she did commit suicide some eighteen days after execution of the will. Under circumstances showing the fiduciary relationship existing between the proponent and the testatrix as husband and wife, his "unduly profiting by the will, . . . its being unnatural, and [his] activity . . . in procuring its execution," it was held that there was "persuasive evidence of undue influence" as found by the jury. (25 Cal.2d 528.)

At most, the record here shows no more than that Arthur was so situated as to have had an opportunity to unduly influence the mind of Myrtle, and that his actions and conduct at times might be regarded as suspicious; but to say that from such evidence it may be found that Arthur "overpowered the mind and bore down the volition of the [testatrix] at the very time the will was made" would be to permit Myrtle's will to be overturned not upon proof but upon speculation. (*Estate of Gleason,* 164 Cal. 756, 765 [130 P. 872].) Moreover, the final testamentary act in question was Myrtle's execution of the holographic codicil republishing her will, and as to which there was not the slightest basis for finding that it was the product of undue influence by Arthur. (See *Estate of Dobrzensky, supra,* 105 Cal.App.2d 134, 144.) Under the settled rules, it must be held that there is not sufficient evidence in the record on the issue of undue influence to sustain the jury's verdict, and the will and codicil here in question should have been admitted to probate as the last will and testament of the decedent Myrtle F. Welch.

The judgment is reversed.

Shenk, Acting C. J., Edmonds, J., Traynor, J., and Bray, J. pro tem.,* concurred.

SCHAUER, J., Dissenting.—In my view the evidence, construed favorable to sustaining the judgment (see *Estate of*

---

*Assigned by Chairman of Judicial Council.

*Bristol* (1943), 23 Cal.2d 221, 223-224 [143 P.2d 689] ; *Estate of Teel* (1944), 25 Cal.2d 520, 526 [154 P.2d 384] ; *Estate of Jamison* (1953), 41 Cal.2d 1, 13 [256 P.2d 984]), amply supports all essential implied findings of the jury. Accordingly, I would affirm the judgment.

CARTER, J.—I dissent.

Section 19 of article VI of the Constitution of California provides: ''The court may instruct the jury regarding the law applicable to the facts of the case, and may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the case. *The court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of the witnesses.''* (Emphasis added.)    And section 371 of the Probate Code provides ''Any issue of fact involving . . . the due execution and attestation of the will, or any other question substantially affecting the validity of the will, must be tried by a jury unless a jury is waived. . . .''

The foregoing provisions make it abundantly clear that fact finding in cases involving wills is as essentially the province of a jury as in any other field of the law. I expressed my views in this respect in my dissent in *Estate of Lingenfelter*, 38 Cal.2d 571 at page 588 [241 P.2d 990], and I cannot refrain from reiterating here that the majority of this court has, in this field of the law probably more than in any other, violated express constitutional and statutory mandates by assuming the role of the fact finder and reversing judgments based upon jury verdicts which have not only been approved by the trial judge but have been affirmed by a unanimous decision of a District Court of Appeal and where this court has been divided on the very issue of the sufficiency of the evidence to support the verdict. In this case, we have 10 jurors rendering a verdict on the issue of undue influence; we have an able and outstanding trial judge denying motions for a nonsuit, directed verdict, judgment notwithstanding the verdict and for a new trial; and three able and eminent jurists of the District Court of Appeal rendering a unanimous decision affirming the judgment (*Estate of Welch* * (Cal. App.) 261 P.2d 18)—holding the evidence sufficient to establish the issue of undue influence. In addition to the above

---

*A hearing was granted by the Supreme Court on November 19, 1953.

we have Mr. Justice Schauer and myself on this court—a total of six judges in addition to the 10 members of the jury —all of the opinion that the evidence is sufficient to support a finding of undue influence.

It is impossible for me to rationalize or reconcile the position of the majority here with any concept of the well recognized and traditional rule that an issue of fact becomes an issue of law only where the evidence is such that only one conclusion can be reached by reasonable minds. In other words if the evidence is such that reasonable minds might differ as to the conclusion to be reached, the issue is one of fact and not law, and an appellate court is bound by the determination of the trier of fact. I say that I cannot rationalize or reconcile the position of the majority in this case with such a rule when we have 10 jurors and six judges taking the position that there is sufficient evidence that the will and codicil were procured by undue influence, and only five justices of this court taking the position that there is no substantial evidence to this effect.

I think it is time that this court should speak more frankly in cases of this character and honestly state the basis for its refusal to recognize the well settled and traditional rule with respect to the question of when there is an issue of fact to be determined. In the case at bar it is obvious that the majority of this court has weighed the evidence and come to the conclusion that it is insufficient to support a finding of undue influence. In so doing the majority has violated the Constitution of this state in depriving the litigants in this case of their right to a trial by jury. The majority has done this by substituting its view as to the weight of the evidence for that of the jury, the trial judge, the three members of the District Court of Appeal and two members of this court. There is no question in my mind but that the majority decision in this case is based solely upon the view that it and not the jury or the trial judge should determine factual issues in cases of this character. This view is in direct conflict with the Constitution and statutes of this state, and in my opinion a judge of this court who concurs in such a decision is violating his oath of office.

To say that there is no evidence of undue influence exercised by the proponent of the will and codicil over the testatrix in this case is shocking to my sensibilities. The evidence shows that when Arthur returned after the death of Myrtle's husband she had made up her mind to sell her home and live

with her sister Geraldine. Arthur told her she should not do so. At that time he said to her, "Myrtle, now that Fred is gone, you will have to make out a new will, and if you will everything you have to me, I will will everything I have to you." He then told Geraldine to "Take your things and get out of here. I am going to stay with Myrtle." He then lived with Myrtle and kept her under his surveillance and refused to permit any of her relatives to visit her. She made a will in accordance with his demands within three weeks thereafter. He continued to live with her and keep her under his surveillance for approximately two years and then she executed a codicil naming him as executor without bonds. He permitted her to lie in a filthy bed without medical or nursing care when she was sick and dying and would not permit her relatives to visit her. To say that an inference of undue influence could not be drawn from such conduct is to disregard that which any fair and reasonable minded person would be justified in concluding if he believed the evidence on behalf of contestants.

To my mind the evidence of undue influence in this case is overwhelming, and the reversal of the judgment denying probate to the will and codicil here involved will result in a rank miscarriage of justice. I would therefore affirm the judgment.

Respondent's petition for a rehearing was denied July 28, 1954. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.