[Civ. 24470.   Second Dist., Div. Three.   Oct. 28, 1960.]

Estate of MILDRED C. FERRIS, Deceased. MARGARET BRESSLER, Appellant, v. ALBERT H. ALDERTON, Respondent.

Marcus, Rabwin, Nash & Naiditch and A. P. Coviello for Appellant.

Elbert Heiserman and A. Maurice Rogers, Jr., for Respondent.

BISHOP, J. pro tem.*—It might be said that the evidence requires, it most certainly gives substantial support to, the trial court's findings that the mutual will of contestant's parents, which upon her father's death became the will of her mother, was not subject to any of the defects alleged in the *Contest of Will.* As a consequence, we are affirming the judgment admitting the will to probate, from which the contestant has appealed.

*Assigned by Chairman of Judicial Council.

The contestant was not lacking in audacity in her attack upon the will. She affirmatively alleged: That the will offered was not the last will of her mother; that it had not been subscribed by her in the presence of the alleged subscribing witnesses; that it had not been declared by her to be her will; and that, if it was signed by her mother, it was under duress, restraint, undue influence, and fraudulent representations and statements on the part of Albert H. Alderton, the contestant's mother's brother, to whom all of her estate was left, save the one dollar that went to the contestant.

It is quite apparent that the contestant swore falsely when she verified the pleadings that initiated the contest, in stating that its allegations were true of her own knowledge. Not only were there witnesses at the trial who positively identified the will offered as the one signed by Mr. and Mrs. Ferris, the contestant's parents, who testified that her parents each declared the will to be their will and that each had signed it in the presence of the witnesses, but the contestant was not among those present at the signing of the will, and so could not "of her own knowledge" state what had then occurred. Nor did she produce any evidence that cast doubt upon that given, and as a witness she admitted that she knew of no later will. The credibility of one who so readily swears falsely may well have been doubted.

Beyond question the only serious attack upon the will was made on the ground that it was the product of undue influence. We are told what "undue influence" is, as applied to the making of a will, in *Estate of Welch* (1954), 43 Cal.2d 173, 175 [272 P.2d 512, 514] : "In *Estate of Arnold,* 16 Cal.2d 573, at page 577 [107 P.2d 25], the rules governing the determination of whether a testamentary instrument is the product of undue influence are stated as follows: 'In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. (*Estate of Motz,* 136 Cal. 558, 583 [69 P. 294].) Evidence must be produced that pressure was brought to bear directly upon the testamentary act. (*In re McDevitt,* 95 Cal. 17, 33 [30 P. 101].) Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will and must amount to *coercion* destroying free agency on the part of the

testator. (*Estate of Keegan,* 139 Cal. 123, 127 [72 P. 828].) . . . ▮ mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. (*Estate of Easton,* 140 Cal.App. 367, 371 [35 P.2d 614].)

" ' "The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of 'a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.' " (*Estate of Gleason,* 164 Cal. 756, 765 [130 P. 872].) ' (Citing cases.) "

▮ "Undue influence," obviously, is not something that can be seen, heard, smelt or felt; its presence can only be established by proof of circumstances from which it may be deduced. It makes little difference, in this case, whether we review the evidence most favorably to the finding of the trial court, as of course we must, or most favorably to the defeated contestant; it does not warrant the conclusion that the will in question was the result of undue influence.

▮ Certain facts appear beyond any serious dispute; most of them from the contestant's own lips. She was married to Mr. Bressler in July of 1946. The place where her parents lived had been acquired by a deed which made the parents and the contestant joint tenants. Just before her marriage she conveyed to her parents her interest in the property because, as she testified, ". . . there was a ruckus because I was going to marry Mr. Bressler and my mother and father just made it so impossible I said 'All right, I will sign it.' "

Thereafter, sometime in 1947 or 1948, the contestant and her husband built and moved into an apartment next to that of her parents. The proponent of the will, the uncle of the contestant, came to live with her parents, sometime in 1949, 1950 or 1952, depending on whom you would believe. At first all was smooth sailing, but trouble developed; whether justified or not, does not clearly appear, the uncle came not to like his niece's husband, and his sister, the decedent, agreed with him about her new son-in-law. The upshot was that, in July 1954, the couple moved out of their apartment, never to return. Trouble had arisen between the contestant and her mother and had existed for some time, she testified. After moving out she called her mother on the telephone but the latter would not talk to her. For some four or five years before they died (in September and November 1957), accord-

ing to the contestant's inaccurate memory, she had not laid eyes on either parent except at the trial of the action brought by her and her husband against them. The contestant, after her father's death, told a neighbor that she hated her mother.

Within less than a month of the breakup the will in question was executed, on June 23, 1954. A few days earlier, Mr. Ferris and the proponent stopped by the office of the lawyer who drew it, but on this first visit had no time to discuss it. Mr. Ferris had with him a handwritten draft prepared by proponent, which he left with the lawyer. A day or so later Mr. Ferris returned alone to discuss the terms desired. He had never heard of a mutual will and accepted the suggestion that that would be better. He expressed his disapproval of his daughter's attitude, with whom he reported some difficulty over business affairs, as one reason they would not leave her more. The lawyer telephoned Mrs. Ferris to check with her the terms proposed, including the $1.00 to her daughter; they met with her approval.

The lawyer, thereupon, himself typed the will, paying no attention to the copy fashioned by the proponent, and he at no time discussed terms with the proponent. The Ferrises were driven to the lawyer's office by the proponent when the will was ready but he sat back at the magazine desk, taking no part in the conversation. The lawyer handed a copy of the will as prepared to Mr. Ferris and one to Mrs. Ferris, and offered to read it over to them, but one of them said "We can read it." Both appeared to be reading and both said that they had; Mrs. Ferris said it was all right. It was executed. A copy was given each and they left. No copy was given the proponent.

So far, certainly, the trial court would have no reason to conclude that the will was the result of any brain washing of the Ferrises or to doubt that it expressed anything other than their preferences. It expressed the mother's desires, as she revealed them to a neighbor and to the proponent. To be sure, the latter was an interested party—but whether or not he spoke the truth was for the trial judge to say. Nor is any doubt about it to be found in the characterization, by several witnesses, of Mrs. Ferris as a dominating personality, dictatorial, who tried to run her daughter's life. Indeed there is no evidence whatever that the proponent had done anything that would support the conclusion that he had exerted "a pressure which overpowered the mind and bore down the volition of the testator." To be sure, there were circumstances

consistent with the exercise of undue influence; he lived with them and shared their dislike of their daughter and her husband. ▮ But, as further stated in *Estate of Welch, supra* (1954), 43 Cal.2d 173, 178 [272 P.2d 515-516]: "It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence; but before the will can be overthrown the circumstances must be *inconsistent* with voluntary action on the part of the testator. (*Estate of Donovan,* 114 Cal.App. 228, 233 [299 P. 816].) Arthur, in living alone with Myrtle, may have had the opportunity to unduly influence her but there was no evidence produced by the contestant so bearing upon the testamentary act or anything indicating coercion or lack of free agency on the part of Myrtle when she executed the will. . . . Consanguinity of itself does not create a fiduciary relationship. (*Estate of Llewellyn, supra,* 83 Cal.App.2d 534, 562 [189 P.2d 822, 191 P.2d 419].) Myrtle's mental and physical condition was not shown to have been such as to permit a subversion of her freedom of will or to negate her independent management of her own affairs. On the contrary, so far as appears from the record, Myrtle was at all times a clear thinking, deliberate woman, aware of her property holdings and financial situation. . . ."

None of the grounds of the contest was substantiated.

The appeal from the order (nonexistent) admitting the will to probate is dismissed; judgment admitting the will to probate is affirmed; the appeal from the order (nonappealable) denying the contestant a new trial is dismissed.

Vallée, Acting P. J., and Ford, J., concurred.