Filed 12/11/13  Estate of Moynes CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ESTATE OF RUTH B. MOYNES, Deceased. | |
| LYNN LINTZ, Plaintiff and Respondent, v. MARILU RAMIREZ, Defendant and Appellant. | A137559 (San Mateo County Super. Ct. No. PRO116317) |

Ruth Moynes died in 2006 at the great age of 100.  Plaintiff Lynn Lintz, the decedent's executor and the sole beneficiary of her pour-over trust, brought suit to recover various sums alleged to have been improperly obtained by Moynes' long-time caregiver, Ruby Waltrip, and Waltrip's daughter, appellant Marilu Ramirez.  At the conclusion of a two-stage bench trial, the trial court entered judgment for Lintz and against Ramirez for approximately $1.250 million.  Ramirez attacks the judgment on a number of grounds, but she directs her primary fire at the trial court's finding that the decedent had been the victim of undue influence.  We find no error, and we affirm.

**BACKGROUND**

Less than a year after Moynes died, Lintz filed her "Petition To Determine Title To And Require Transfer of Personal Property to Estate" against Waltrip and Ramirez.  The gist of the petition was two-fold:  (1) Moynes was induced "by fraud, undue influence and duress" to create a number of bank accounts with Waltrip as a joint tenant,

1

and; (2) Moynes was induced, again "by fraud, undue influence and duress," to sell her residence to Ramirez in 2005. Lintz prayed for "an order determining that the above-described money and property belong to the estate of Ruth B. Moynes, that title to the above-described money and property is rightfully in Petitioner as administrator of the estate of Ruth B. Moynes, that Ruby Waltrip [and] Marilu B. Ramirez . . . are directed to convey such money and property to Petitioner as administrator, for damages equal to twice the value of such property and for such other relief as this Court deems appropriate." The petition came on for hearing before an experienced probate court judge, in connection with which hearing two unusual points of procedure should be briefly mentioned at the outset.

First, the trial court took evidence on two occasions, the second occurring after the court had filed a tentative decision and a judgment. The court then granted a partial new trial that amounted to reopening the evidence. The court then confirmed its tentative decision, and ordered entry of a new judgment. Neither party challenges the propriety of the procedures that culminated in the entry of the second judgment, the one from which Ramirez has appealed. Nor does either party object to the court's tentative decision—as augmented with the subsequent confirmation order—being treated as a formal and final statement of decision.

Second, the trial court heard no live testimony, but decided the matter exclusively on the basis of declarations and other writings. Although the court was initially cautious of this approach ("How do you expect me to evaluate the issue of credibility?"), it accepted the parties' stipulation that the case was to be submitted solely on a documentary basis. This methodology does not impact how the court's ultimate judgment is to be reviewed. "The trial court determines the weight of evidence and the credibility of a declarant in matters submitted upon declarations" (*Van Slyke v. Gibson* (2007) 146 Cal.App.4th 1296, 1300), and those determinations are protected by the ordinary presumptions and rules governing substantial evidence. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479; *Kulko v. Superior Court* (1977) 19 Cal.3d 514, 519, fn. 1; *In re Marriage of Nurie* (2009) 176 Cal.App.4th 478, 492.)

A comparison of the parties' briefs establishes that they implicitly agree that most of the historical events and essential details are undisputed. We therefore adopt, with minor nonsubstantive changes, the following narrative in the trial court's detailed 20-page statement of decision[1]:

Ramirez's mother, Ruby Waltrip, was the caretaker of decedent Ruth Moynes. "Moynes lived at her home [in] Daly City, California for many years until she died on September 14, 2006, at the age of 100. Lintz considered Moynes her 'Aunt' because Lintz's grandmother was a close personal friend of Moynes, and Moynes treated Lintz's mother, Jacqueline Pierce, like a daughter. Lintz, her mother, Jacqueline Pierce, and her father, William Pierce (hereafter 'Pierce') also assisted in taking care of Moynes to some degree for some period of her life, yet their direct interaction with Moynes lessened toward the end of Moynes's life. Since 1997, Moynes was cared for by professional caregiver Waltrip, to whom Moynes had no other personal relationship prior to her employment. . . . [C]heck registers provided by [Lintz] suggest that, at one point in time in early 2005, Moynes was paying Waltrip $750.00 periodically, about every week.

"Petitioner Lintz was named Executrix in a Last Will and Testament executed by Moynes on April 18, 1994. Moynes's Will instructed that the estate was to be 'poured over' into her living trust, also dated April 18, 1994 and in which Lintz was named Trustee and sole beneficiary.

"At the time of execution, Moynes's trust contained bank accounts and personal property, but did not include her Daly City home. Moynes had originally acquired the home in 1961. In 1970, Moynes executed a deed transferring title to herself and Jacqueline and William Pierce, as joint tenants. Pierce's wife, Jacqueline, was very close with Moynes because Jacqueline's mother was best friends with Moynes. In 1979, title was reconveyed, granting Moynes a life estate, with remainder to Jacqueline and William Pierce as joint tenants. Jacqueline Pierce died in 1998, leaving Moynes and William

---

[1] Among these changes are deletion of the numerous citations by the trial court to evidence received at the trial.

3

Pierce as the owners of record. [¶] The Daly City home was owned free and clear as of March 1, 2004 . . . .

"On March 4, 2004, Moynes executed a deed of trust and obtained a loan for $200,000 which Lintz was told would be used to pay for Moynes's care. Lydia Palma, Waltrip's sister and Ramirez's aunt, was to some extent involved in acquiring this loan. Palma assisted William Pierce in obtaining his wife's death certificate from Canada to validate his interest in Moynes's property, in order to facilitate the loan. . . . [¶] . . . [¶]

"On March 22, 2004, Moynes and Pierce executed another deed of trust to obtain a loan of $57,000.

"Ramirez asserts that Moynes approached her about buying Moynes's home because Moynes was afraid that Lintz and Pierce would put her in a nursing home. . . . There is no evidence that either Lintz or Pierce intended or took any action to place Moynes in a nursing home . . . .

"Ramirez claims she did not want to purchase Moynes's home at first because she didn't have the money, and her husband would not approve. However, after Moynes allegedly reassured Ramirez that Moynes would help her finance the purchase of the home, Ramirez agreed to move forward with the sale.

"Moynes told Lintz that the home transaction from Moynes to Ramirez involved the agreement that Moynes would be able to remain living in the home and have her living expenses covered. Lintz cannot recall any conversations with Ramirez regarding the terms and conditions of the house sale. Ramirez herself claims that Moynes allegedly told Ramirez not to tell anyone about the sale of the house.

"On December 22, 2005, Moynes allegedly signed a typed, notarized letter of consent to sell her property, which acknowledged Moynes's awareness of selling her Daly City property to Ramirez for a below market price, in as-in condition, in gratitude of everything that Waltrip had done for her, and also with the agreement that Ramirez would allow her to remain living in the home rent-free . . . .

"On January 19, 2005, Ramirez purchased Moynes's residence for $600,000. Pierce received $100,000 on January 20, 2005 as a result of the sale."

4

"Ramirez acquired financing for the house from Palma, her aunt. Palma appears to have assisted in recommending both an appraiser and a real estate broker for this transaction, and the nature of her working relationship with each is uncertain.

"Ramirez acknowledges receipt of $100,000 from Moynes in the form of a cashier's check at some point after the signing of the documents in the home transaction, which Ramirez claims to have split into smaller checks that she stored in her safety deposit box. Ramirez also acknowledges receipt of three checks in the amount of $2,000 each from Moynes. Ramirez describes these checks as a 'thank you' from Moynes. Thus, the evidence shows that on or about the time Moynes conveyed her home to Ramirez, Moynes also paid Ramirez $106,000."

"After the sale of the home, and after Moynes's death, Lintz forwarded some 'bills' to Ramirez with the expectation that these would be covered by the agreement between Ramirez and Moynes for Ramirez to cover Moynes's living expenses up to her date of death. There is no evidence as to whether these bills were ever paid.

"At some point during Moynes's lifetime, Moynes established bank accounts and certificates of deposit in joint tenancy with Moynes and Waltrip named as account holders. Only Moynes's assets were deposited into these joint accounts, yet Waltrip made many withdrawals. . . . Waltrip testified that she used the money or gambled away much of the funds. Lintz argues that much of the funds were transferred to Ramirez.

"Through an accounting audit, Lintz alleges a pattern of withdrawals by Waltrip over time, coinciding with substantial deposits in Ramirez's accounts shortly thereafter. It is undisputed that the parties cannot explain all of these transactions. Lintz alleges the following transactions:

> "Withdrawal of $50,000 from Moynes/Waltrip joint account on October 18, 2005, followed by an $11,000 deposit in Ramirez's account on November 8, 2005.

> "A $50,000 withdrawal from Moynes/Waltrip joint CD on July 25, 2006, followed by deposits of $3,000 on July 31, 2006 and $10,331.85 on August 18, 2006 in Ramirez's account.

"A withdrawal of $35,700.27 from Moynes/Waltrip joint account on July 31, 2006, followed by a $7,000 deposit on September 5, 2006.

"Withdrawal of $10,101.80 from the Moynes/Waltrip joint CD on September 5, 2006, followed by a deposit of the same amount, $10,101.80 on the same day.  [¶] . . . [¶]

"Ramirez had 29 open accounts between 2004 and 2006.  Ramirez did not provide an accounting for her holdings or any explanation for the source of these funds."

The trial court first analyzed the issue of whether improper advantage had been taken:

"One way the Probate Code addresses the vulnerability of dependent adults to undue influence is by specifically limiting donative transfers to certain persons who have special relationships with the testator and disqualifying such persons from validly receiving gifts from the testator.  Probate Code section 21350(a)(6)-(a)(7) provides:  'No provision . . . of any instrument shall be valid to make any donative transfer to . . . [a] care custodian of a dependent adult who is the transferor, [or a] person who is related by blood . . . to [said care custodian].'  A donative transfer or gift is 'transfer of personal property, made voluntarily, and without consideration.'  (Civil Code section 1146.)  Under Probate Code section 21351(d), the transferee may attempt to rebut this presumption of invalid transfer to disqualified persons by a showing of clear and convincing evidence that undue influence, fraud, duress or menace did not occur. [¶] . . . [¶]

"It is undisputed that Waltrip was Moynes's paid care custodian and the evidence establishes a confidential relationship existed.  Waltrip was paid for her services to care for Moynes from approximately 1997 until Moynes's death in 2006.  Check registers provided by Lintz suggest that, at one point in time in early 2005, Moynes was paying Waltrip $750.00 periodically, about every week.  This pattern is consistent with a salary for services.

"This court finds, as a matter of law, that Waltrip was the decedent's care custodian, is disqualified from receiving donative transfers from Moynes based upon

6

Probate Code section 21350(a)(6). It follows that Ramirez, as Waltrip's daughter and blood relative, is also disqualified from receiving donative transfers from Moynes based upon Probate Code section 21350(a)(7).

"The transferee bears the burden of rebutting this presumption of disqualification by clear and convincing evidence, excluding testimony from the care custodian . . . . Ramirez, the transferee, bears this burden of proof."

"Evidence of Moynes's alleged alertness during a visit with a physician on August 25, 2006 does not rebut disqualification under Probate Code section 21351(d). Furthermore, the same physician wrote of concern for Moynes's 'diminished and frail condition' on January 15, 2004, one year before the home transaction. This court finds that as of January 15, 2004, Moynes suffered a diminished capacity whereby she was unable to resist fraud or undue influence.

"Ramirez's chief argument, in the transfer of Moynes's assets to her, is that Ramirez was motivated to relieve Moynes's alleged fear that Moynes would not be able to live in her home until her death. Prior to the home transaction, Moynes had a legal right to stay in her home because she owned a life estate interest. Yet after the transfer to Ramirez, Moynes lost all legal title in her property. Since there was no evidence that Lintz or Pierce actually intended to place Moynes in a nursing home, this court finds that such motivating fear was the product of fraud and undue influence. This Court finds that Ramirez's argument that she acted to benefit Moynes is not credible.

"The court finds that Ramirez does not provide clear and convincing evidence from uninterested sources (especially sources other than Waltrip) that Moynes was *not* exposed to fraud, menace, duress, or undue influence in relation to transfers to Waltrip and Ramirez.

"Additionally, Ramirez does not provide any evidence to rebut her daughter-mother relation to Waltrip, the care custodian of transferor Moynes, nor does Ramirez provide evidence of independent review of the transactions per Probate Code section 21351(b). Thus, any donative transfers Moynes made to Ramirez would be presumptively invalid. Even if the Court were to disregard the presumption, the Court

7

finds clear and convincing evidence submitted establishes constructive fraud and undue influence, especially given the confidential relationship that this court finds to have existed."

The court then addressed a number of transfers of money from Moynes to Ramirez:

"Ramirez acknowledges three cash transfers in the form of checks directly from Moynes in 2005 totaling $6,000. No evidence is provided to verify Moynes's personal knowledge of or permission for these transfers. However, Ramirez herself acknowledges that they were 'gifts.' Furthermore, Ramirez concedes that there would be no reason to receive payments from Moynes, as she did not provide care for her.

"As gifts, these transfers are invalid under Probate Code section 21350(a)(7) because the transfers of funds were donative from a decedent, Moynes, to Ramirez, a blood relative of Moynes's care custodian, Waltrip. Per Probate Code section 45, an 'instrument' is a will, trust, deed, or 'other writing that designates a beneficiary or makes a donative transfer of property.' The personal check, a writing, from Moynes to Ramirez, effectuates a donative transfer of cash, which satisfies the definition of an instrument. Since these transfers are statutorily invalid, Moynes's estate is entitled to reimbursement of the total amount of these transfers of $6,000.00. Ramirez does not provide any evidence that challenges this conclusion.

"Ramirez also acknowledges receipt of $100,000 from Moynes and says that she considered this amount a 'gift.' However, Ramirez claims that the $100,000 'gift' she received from Moynes 'came with an obligation that [Moynes] was going to stay in her house until she died.' Ramirez states that, prior to receiving the check, she did not know that she would receive this amount from Moynes. Since Ramirez concedes the $100,000 was a gift and since Ramirez is a disqualified beneficiary, the $100,000 gift is invalid and must be returned to Moynes's estate per Probate Code section 21350(a)(7).

"In the matter of the sale of Moynes's Daly City residence to Ramirez in January 2005, Lintz argues that the home transaction should be invalid because it was exchanged for $600,000, a sum below fair market value. Ramirez testified that the home

transaction was a valid transfer because Ramirez bought the home in exchange for permitting Moynes to remain living in the home until her death.

"Ramirez's testimony was supported by a typed, notarized letter of consent to sell her property dated December 22, 2005 which Moynes allegedly signed, stating that Moynes was selling her property to Ramirez 'for a lower than market value in an AS IS CONDITION.' It further states in part,

> 'I am fully aware of the market conditions . . . However, [Ramirez] is the daughter of [Waltrip], who has been taking care of me with loving care and devotion for many many years. And this is my way of showing my appreciation and gratitude for all she has done for me. Furthermore, it was our understanding that I will be allowed to live for life in this house without any rent.'

"This court finds that Ramirez's evidence that the sale was an arms-length value for value exchange is not credible. Even if this court were to assume that Ramirez's evidence is true and Ramirez entered into an agreement to exchange the home for health care, such evidence would only establish that Moynes was making a donative transfer and a contractual one. It is donative because Moynes concedes that the lower sale price was a reward or gift for everything that Waltrip, Ramirez's mother, had done for Moynes for many years up to that point. The transfer could only be contractual to the extent that Ramirez provided independent consideration.

"As noted above, however, this court finds that the evidence was a valid exchange of consideration is not credible, and therefore that the entire amount of the transfer is donative. Thus the full amount of the discount is a disqualified gift under Probate Code section 21350(a)(7). Even if it were not barred by statute, this court finds, after weighing all of the evidence, that undue influence was present because no reasonable person would sell the home they had a right to live in for the rest of their life in exchange for the right to live in that home for the rest of their life. This court finds the circumstantial evidence of undue influence to meet the clear and convincing standard."

After determining that Lintz was not entitled to recover for any appreciation in the home's value since its transfer to Ramirez in 2005, the court continued:

9

"Ramirez does not argue that she is a qualified recipient of a gift from Moynes in terms of Probate Code section 21350 . . . . [¶] . . . [¶]

"Since the donative portion of the home transaction from Moynes to Ramirez was invalid per Probate Code section 21350(a)(7), the proceeds of the home sale would have been included in Moynes's estate (per Moynes's pourover will) but for its transfer to Ramirez. An evaluation of the evidence reveals that the valuation of *actual* sales prices of comparable homes is a more accurate representation of what the market would have paid Moynes if she had chosen a buyer other than Ramirez. Appraisals also reflect comparable home prices, but the pre-sale appraisal is more of an estimate and is not as convincing as a post-sale evaluation of actual sales figures. . . . Thus, the court finds that . . . the fair market value of the home was $718,750.

"Therefore, to calculate [the] donative portion of Moynes's transfer to Ramirez (or the 'discount' on the sale price), the actual sale price ($600,000) is subtracted from the suggested sale price ($718,750), to arrive at $118,750. Thus the donative portion of the transfer, $118,750, is invalid and reimbursable to Moynes's estate."

The court then considered the dozens of personal bank and checking accounts in Moynes's name:

"In this matter of alleged cash transfers from Moynes's bank accounts to Ramirez, the court finds that Ramirez received funds from Moynes via Waltrip. There exists a pattern of cash withdrawals out of Moynes's accounts by Waltrip and then substantial amounts deposited by Ramirez within a relatively short time afterwards. Since Waltrip was not independently wealthy (in fact she has declared bankruptcy), it is very unlikely that the corresponding deposits into Ramirez accounts came from a source other than Moynes. This pattern reasonably raises the inference that money was transferred from Moynes's funds to Ramirez. The following transfers are reasonably inferred to originate from Moynes's funds:

> "$1,500 per month for 11 months, commencing November 2005 and ending October 2006, totaling **$16,500**. . . .
>
> **"$11,000** deposited on November 8, 2005 following Waltrip's

Withdrawal of $50,000 from a Moynes/Waltrip joint account
On October 18, 2005.

"$**2,700** on May 31, 2006.

"$**3,000** deposited on July 31, 2006 and **$10,331.85** deposited
On August 18, 2006 after a withdrawal of $50,000 from a
Moynes/Waltrip joint CD account on July 25, 2006.

"$7,**000** on September 5, 2006 deposited after a withdrawal of
$35,700.27 from a Moynes/Waltrip joint account on the
same day, September 5, 2006.

"On September 15, 2006, one day after Moynes passed away, Waltrip withdrew $10,101.80 from a joint Moynes/Waltrip CD account. Five days later, on September 20, 2006, Ramirez made a deposit of the exact same amount, $**10,101.80**. Because of the timing and amounts of this activity, a reasonable inference is that Waltrip gave this money to Ramirez from Moynes's account. Waltrip and Ramirez are both disqualified beneficiaries for donative gifts under Probate Code section 21350, so this transfer is invalidated and Ramirez must return $10,101.80 to Moynes's estate.

"These transactions follow a pattern of deposits after large withdrawals from Moynes's accounts, which reasonably imply donative transfers from Moynes to Ramirez. Whether the funds were improperly acquired or gifts from Moynes, Ramirez does not provide evidence to establish a reason for any of these transfers to be characterized as non-donative, nor do these transfers correspond with any evidence of payment for goods or services. Waltrip and Ramirez are both disqualified beneficiaries for donative gifts under Probate Code section 21350, so these transfers are invalidated and Ramirez must return the sum of these transfers, $**60,633.65**, plus interest, to Moynes's estate.

"Ramirez claims that her habit of poor record keeping should not implicate her in taking money from Moynes nor indicate wrongful conduct. However, Ramirez does not provide explanations for each of these multiple, very significant deposits over a long period of time. Ramirez only claims 'it is just as reasonable to infer the transfers came from Ramirez's other accounts and funds owned before beginning the relationship with

11

Moynes.'  This appears unlikely, as Ramirez's bi-monthly salary, directly deposited into her accounts was $2,500 in 2005 and 2006.  Furthermore, as stated previously, Ramirez's testimony on this issue is not credible.  Ramirez does not meet her burden of rebutting the presumption of donative gifts, and she must return $60,633.65, plus interest, to Moynes's estate."

The court's final determination, and its conclusion, were as follows:

"Lintz also seeks double damages under Probate Code section 859, which imposes liability on a person who, in bad faith, has wrongfully taken, concealed or disposed of property belonging to the estate in the amount of twice the value of the property recovered.[2]  In the present case, Ramirez has wrongfully taken property from Moynes, and has essentially concealed these funds by attempting to characterize the transfers as valid, and neglecting to provide an accounting.  Ramirez exhibits a pattern of behavior that implies bad faith dealings.  Thus, Lintz, trustee of Moynes's estate, is entitled Probate Code section 859 relief.

"Lintz's motion for monetary relief is therefore GRANTED in part.

"Lintz is entitled to $106,000 from direct cash transfers to Ramirez from Moynes made sometime after January 10, 2005, $118,750 of donative discount from the home transaction on January 10, 2005, and $60,633.65 in cumulative transfers from Moynes's accounts deposited into Ramirez's accounts, a total of $285,383.65, plus interest.  Lintz is also entitled to twice this amount in additional relief based upon Probate Court section 859.  Judgment shall be entered against Ramirez in the amount of the sum of these figures . . . plus interest."

---

[2] Statutory references are to the Probate Code unless otherwise indicated.  The cited statute provides in pertinent part:  "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to the estate of a decedent, . . . or has taken, concealed, or disposed of property by the use of undue influence in bad faith . . ., the person shall be liable for twice the value of the property recovered . . . .  The remedy provided in this section shall be in addition to any other remedies available in law to a . . . personal representative or other successor in interest of a decedent."  (§ 859.)

12

Following the slightly unorthodox procedural detour mentioned above, the trial court made the additional determination that "weighing all of the evidence submitted by the parties both during trial and posttrial papers, . . . the weight of the evidence supports a finding that Ruth Moynes was a dependent adult as defined by Welfare and Institutions Code § 15610.23(a)." The court also reiterated its determinations that "the Daly City property was transferred for less than its fair market value, and therefore the transaction was donative; that the evidence, including the accounting submitted by [Ramirez], does not rebut the presumption of invalidity by a preponderance of evidence, let alone meet a clear and convincing evidence standard; and that the evidence establishes that [Waltrip and Ramirez] acted in bad faith such that additional damages pursuant to Probate Code § 859 were proper."

Judgment was entered in due course, whereupon Ramirez perfected this timely appeal.

## REVIEW

As may be gathered from the extensive number of factual determinations made by the trial court, the parties correctly agree that this is largely a substantial evidence appeal. (See *Weil v. Weil* (1951) 37 Cal.2d 770, 788 ["undue influence is a question for the trier of fact, whose decision will not be reversed on appeal if supported by substantial evidence"].) As such, it is subject to familiar, established rules: " 'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court.' " (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.) "All issues of credibility are likewise within the province of the trier of fact. 'In brief, the appellate court ordinarily looks only at the evidence supporting

13

the successful party, and disregards the contrary showing.' [Citation.]" (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925.)

Although it does not appear until near the end of Ramirez's reply brief—after it was addressed by Lintz in her respondent's brief—the crucial point of contention is the trial court's determination that Moynes was a "dependent adult." That determination is the predicate for all other determinations concerning undue influence, donative intent, Waltrip and Ramirez being "disqualified" transferees, and other findings made in the course of applying sections 21350 and 21351. Because of its importance, that determination will be reviewed first.[3]

### Substantial Evidence Supports The Trial Court's Determination That Moynes Was A Dependent Adult

The trial court's finding was made under the cited guidance of Welfare and Institutions Code section 15610.23, subdivision (a), which provides: " 'Dependent adult' means any person between the ages of 18 and 64[4] who resides in this state and who has

---

[3] But only after we briefly address Ramirez's claim, put forth in one paragraph in her brief as "a preliminary matter," that Lintz lacks standing. Although we might ordinarily deem this issue waived for failure to present it in the trial court, as demonstrated in Lintz's brief, " 'contentions based on a lack of standing involve jurisdictional challenges and may be raised at any time in the proceeding.' " (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361, quoting *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 438.) Ramirez's claim appears to be based on the same transfers the trial court found invalid. Assuming the validity of those transfers, Ramirez seems to treat the matter as whether Lintz, as an individual or the ultimate beneficiary, has any sort of personal entitlement to anything Ramirez was ordered to return. But it was Lintz's duty, as executor, to recover assts of the state she believed were in the wrong hands. (See § 850, subd. (a)(2)(D); *Estate of Beach* (1975) 15 Cal.3d 623, 638; *Estate of Rider* (1926) 199 Cal. 742, 745.) Thus, Lintz has always had standing.

[4] An obvious problem is that this definition extends only to persons who have not reached the age of 65, but it is not until Moynes was in her 90s that questions about her mental or physical problems arose. The provision cited is part of the Elder Abuse and dependent Adult Civil Protection Act (Welf. & Inst. Code, §§ 15600-15675). If a person is 65 years of age or older, he is she is deemed an "elder" under that act. (*Id*., § 15610.27.) However, for purposes of the Probate Code provisions cited by the trial

14

physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities, or whose physical or mental abilities have diminished because of age."

Ramirez makes a different issue the keystone of her arguments. Quoting the standards for undue influence that have evolved for will contests under Civil Code section 1575, Ramirez insists there is insufficient evidence to satisfy that standard because there is no evidence that she, personally, exerted improper influence on Moynes, and because there is no evidence that Moynes was not of sound mind when she executed the 2005 sale of her Daly City home.

Ramirez's first point will not detain us long. As the trial court correctly noted, a person who is related by blood to a "care custodian of a dependent adult" is vicariously subject to the prohibition against donative transfers in section 21350.[5] If Waltrip ran afoul of the prohibition, Ramirez cannot benefit thereby, no matter how blameless she might otherwise be.

"Undue influence" is shadowy concept found in the statutes governing conduct events from 2004 to 2006, the time frame here.[6] The term does not appear in

_____

court, the quoted definition "also include those persons who (1) are older than age 64 and (2) would be dependent adults, within the meaning of [Welfare and Institutions Code] Section 15610.23, if they were between the ages of 18 and 64." (§ 21350, subd. (c).) The Probate Code provisions apply "to instruments that become irrevocable on or after September 1, 1993, and before January 1, 2011" (§ 21355, subd. (a)), and will be repealed January 1, 2014 (*id.*, subd. (b)).

[5] "[N]o provision, or provisions of any instrument shall be valid to make any donative transfer to any of the following: [¶] . . . [¶] (6) A care custodian of a dependent adult who is the transferor. [¶] (7) A person who is related by blood . . . to . . . a person who is described in paragraph (6)." (§ 21350, subd. (a).)

[6] It was added to the Elder Abuse and Dependent Adult Civil Protection Act effective 2009 (see Welf. & Inst. Code, § 15610.30, subd. (a)(3), added by. Stats. 2008, Ch. 475, § 1), and to the Probate Code statutes that will supersede sections 21350 and 21351, effective January 1, 2014. (See §§ 21380, 21382, added by Stats. 2010, ch. 620, § 7.)

section 21350, but it does in subdivision (d) of section 21351.[7] Moreover, the definition of "dependent adult" quoted above—with its inclusion of "mental limitations" and diminished "mental abilities"—almost invites the mind to think of undue influence. But undue influence is not a definitional component of being a dependent adult. Being a dependent adult is by itself sufficient to activate section 21350.

Ramirez treats as dispositive the issue of whether Moynes's mental state satisfies requirement of undue influence, hence her assertion that "the physical condition of Moynes has no probative value in determining whether her will was overborne." This may be abstractly correct (but see fn. 7, *ante*), yet it does not control the issue of whether the decedent qualified as a dependent adult.

"Undue influence . . . is the legal condemnation of a situation in which extraordinary and abnormal pressure subverts independent free will and diverts it from its natural course in accordance with the dictates of another person." (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 605.) Ramirez treats undue influence as requiring proof that the victim was not of "sound mind." Ramirez views the trial court as basing its decision solely "on a single letter from Dr. Hoddinott," Moynes primary physician, who, while concluding in January 2004 that Moynes was "diminished and frail," also concluded in August 2006 that Moynes was "alert and lucid mentally" less than a month before she died. This approach is misguided.

Ramirez does not challenge the validity of the court's findings concerning Moynes' physical state in the years 2004 and 2005. Indeed, we do not think such a challenge could be made. The evidence supporting those findings, including Dr. Hoddinott's testimony on which Ramirez places so much emphasis, establishes

_____

[7] "Section 21350 does not apply if any of the following conditions are met: [¶] . . . [¶] The court determines, upon clear and convincing evidence, but not based solely upon the testimony of any person described in subdivision (a) of Section 21350, that the transfer was not the product of fraud, menace, duress or undue influence. If the court finds that the transfer was the product of fraud, menace, duress or undue influence, the disqualified person shall bear all costs of the proceeding, including a reasonable attorney's fees." (§ 21351, subd. (d).)

beyond any reasonable doubt that Moynes met the statutory definition of a dependent adult, which would activate the prohibitions of section 21350.

"It is an established rule of appellate procedure that if there is a finding of fact that is dispositive and necessarily controls the judgment, the presence or absence of findings on other issues is inconsequential. In other words, sometimes a single finding is all that is really important." (*Alpine Ins. Co. v. Planchon* (1999) 72 Cal.App.4th 1316, 1320.) The finding that Moynes was a dependent adult may have this significance, meaning that we could stop here. However, out of respect to the trial court's conscientious and thorough efforts, and because the merits have been thoroughly developed in the parties' briefs, we shall address other issues.

Ramirez's implicit premise, that "undue influence" as used in section 21351 is identical with that developed under Civil Code section 1575 seems misplaced. When the Legislature wants to do that it has used express language to that effect. (See Stats. 2008, ch. 475, § 1, adding Welf. & Inst. Code, § 15610.30, subd. (a)(3) and amending the definition of "financial abuse" to include "taking, secreting, appropriating, obtaining or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 1575 of the Civil Code"; Stats. 1995, ch. 977, § 1, adding. Gov. Code, § 820.21 and withdrawing immunity from government employees who obtain "testimony by . . . undue influence, as defined in Section 1575 of the Civil Code.") The Legislature has not done that with respect to sections 21350 and 21351. It must therefore be concluded that a slightly different concept was intended when the concept of undue influence was allowed in sections 21350 and 21351. The most obvious meaning is that the emphasis was expanded from the mental to also extend to "physical . . . limitations," "physical . . . disabilities," and "physical . . . abilities [that] have diminished because of age."[8] (Welf. & Inst. Code, § 15610.23, subd. (a), quoted in full, *ante*.) Thus, Ramirez

---

[8] This may be only a matter of degree, given that decisions finding undue influence with life care contracts have always given attention to the victim's physical condition. (E.g., *Stenger v. Anderson* (1967) 66 Cal.2d 970, 973, 979; *Johnson v. Studley* (1926) 80 Cal.App. 538, 556, 559-560.)

17

departs from the statutory text by equating—and restricting—undue influence to purely mental impairment.

In addition, to judge from the evidence selectively cited in her brief, Ramirez also appears to believe that, presuming the issue is the soundness of Moynes's mind, expert medical evidence is to be preferred or treated as more credible. Not so. Undue influence may be proved by circumstantial evidence. (*David v. Hermann* (2005) 129 Cal.App.4th 672, 684; *Estate of Mann* (1986) 184 Cal.App.3d 593, 607; cf. *Estate of Ferris* (1960) 185 Cal.App.2d 731, 734 [" 'Undue influence,' obviously, is not something that can be seen, heard, smelt or felt; its presence can only be established by proof of circumstances from which it may be deduced"].) Relevant circumstances can include " ' ". . . control over the decedent's business affairs, dependency of the decedent . . . for care or attention . . . ." ' " (*Estate of Baker* (1982) 131 Cal.App.3d 471, 481.) And while undue influence must be shown to have been exerted on the testamentary or donative act of the decedent, the exertion does not have to be demonstrated as of the moment the decedent's act was executed, but may encompass conditions before and after the act. (*Ibid.*)

Moreover, even if uncontradicted, the trial court, as the trier of fact, could disbelieve any and all of Ramirez's declarations and evidence. (E.g., *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890; *Lohman v. Lohman* (1946) 29 Cal.2d 144, 149.) Our review of the record, keeping in mind that Ramirez's evidence and testimony was repeatedly found not credible, demonstrates that the supporting circumstantial evidence of undue influence is strong. Ramirez makes no appreciable attempt to knock down the reasoning behind the court's finding that "undue influence was present because no reasonable person would sell the home they had a right to live in for the rest of their life in exchange for the right to live in that home for the rest of their life. This court finds the circumstantial evidence of undue influence to meet the clear and convincing standard."

Also pertinent, and also unchallenged by Ramirez, is this additional finding: "Ramirez's chief argument, in the transfer of Moynes's assets to her, is that Ramirez was

18

motivated to relieve Moynes's alleged fear that Moynes would not be able to live in her home until her death. Prior to the home transaction, Moynes had a legal right to stay in her home because she owned a life estate interest. Yet after the transfer to Ramirez, Moynes lost all legal title in her property. Since there was no evidence that Lintz or Pierce actually intended to place Moynes in a nursing home, this court finds that such motivating fear was the product of fraud and undue influence. This Court finds that Ramirez's argument that she acted to benefit Moynes is not credible."

Ramirez does not challenge the finding that Waltrip and Moynes had "a confidential relationship." With Lintz and Pierce eliminated, it is a reasonable construction of this finding is that Moynes's "motivating fear" of ending up in a rest home "was the product of fraud and undue influence" exerted by Waltrip and/or Ramirez. With Moynes's powers of resistance undermined by her weakened physical state, playing upon that fear qualifies as undue influence.

There are also attendant circumstances that take the sale out of the realm of ordinary arms-length transactions. The purchase price was provided to Ramirez by her aunt. The aunt also arranged for the broker and the appraiser. Most oddly, Ramirez not only got the property, she also received $106,000 from Moynes which she—Ramirez— then reduced to "smaller checks that she stored in her safety deposit box." All of this is hard to square with "Ramirez's claim that she did not want to purchase Moynes's home at first because she didn't have the money, and her husband would not approve." And remember, in the background is Waltrip, Ramirez's mother, being paid $750 every week to care for Moynes, all the while apparently removing money from Moynes's bank accounts in order to fund her gambling or personal needs. To detect undue influence from these circumstances is not a rash conclusion, particularly after the trial court specifically found that Ramirez's evidence "that the sale was an arms-length value for value exchange is not credible," nor was Ramirez's "argument that she acted to benefit Moynes."

Finally, the quoted finding on undue influence was preceded by "Even if it were not barred by statute . . . ." because Ramirez, through Waltrip, was a disqualified person

by section 21350. Thus, even if Ramirez prevailed on overturning the finding of undue influence—and she does not—this statutory disqualification would, as already mentioned, by itself constitute a sound basis for the judgment. There is no dispute Moynes was over 65 and had physical problems caring for herself that necessitated Waltrip's employment since 1997. Moynes's physical limitations were sufficient to qualify her as a dependent adult without need to consider her mental condition. Under the circumstances present here, that qualification is established as a matter of law, with the corollary that Ramirez's disqualification under section 21350 is equally manifest. In other words, Ramirez's disqualification is, as the trial court concluded, shown, not as a matter of contested fact, but "as a matter of law."

Ramirez's disqualification moots other of her contentions. Section 21350, quoted at footnote 4, *ante*, operates to disqualify specified groups from receiving any "donative transfer" made by "any instrument." The instruments in this instance would be the documents generated in connection with the 2004 loans and the 2005 sale of Moynes's Daly City residence. With Ramirez's disqualification by section 21350 established, there is no need to consider her contentions that: (1) "the trial court erred in finding the sale of [Moynes's] Daly City home was donative because Moynes received full value for her life estate interest in the property"; (2) "the trial court erred in finding the $100,000 Mrs. Ramirez received from Moynes was donative because it was consideration for allowing Moynes to live in the property the rest of her life"; (3) "there is no evidence that any provision of an instrument made a donative transfer to Mrs. Ramirez as required by Probate Code section 21350" and; (4) "insufficient evidence exists to support a conversion theory." Value and consideration are, in this context, irrelevant.

A related argument from Ramirez is that even if undue influence is demonstrated, the only remedy under Civil Code section 1567 is rescission. Not true. Rescission is not the exclusive remedy in a court exercising equitable powers (*General Acc. Etc. Corp. v. Indus. Acc. Com.* (1925) 196 Cal. 179, 189; *Mabry v. Randolph* (1908) 7 Cal.App. 421, 426), and the probate court can exercise such powers, which include ordering misappropriate funds returned to the estate. (*Estate of Kraus* (2010) 184 Cal.App.4th

20

103, 114-115.)  The court's probate power was invoked by Lintz when she filed her "Petition To Determine Title To And Require Transfer Of Personal Property To Estate," and prayed "that this Court exercise its equitable powers."  The court was therefore authorized to hear and decide all "claims, causes of action, or matters that are normally raised in a civil action." (§ 855.)  Put another way, the court was simply ordering Ramirez to make restitution, which is a recognized equitable remedy to prevent unjust enrichment.  (*American Psychometric Consultants, Inc. v. Workers Comp. Appeals Bd.* (1995) 36 Cal.App.4th 1626, 1645; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 1013, p. 1102.)  Finally, Ramirez's argument overlooks the express statutory grant of double recovery, which section 859 declares is "in addition to any other remedies available."[9]

### The Trial Court's Findings On The Monetary Transfers Are Supported by Substantial Evidence And/Or Legally Correct

Ramirez contends that "the trial court erred in assigning damages to transfers made from Joint Tenancy accounts after Moynes' death" because "upon Moynes' death the accounts and proceeds passed to Waltrip" who then enjoyed "full ownership of the funds and they were not part of the Moynes estate."  This may be true in most instances, but not, as the trial court correctly determined, where "Waltrip and Ramirez are both disqualified beneficiaries," thus "invalidating" all of the transfers and requiring reimbursement to Moynes's estate.

This is also true as to Ramirez's argument that those transfers "were not donative because there was an agreement whereby Waltrip had a restricted right to withdraw funds" "for Moynes' use," that is, "for Moynes' care and emergency situations."  The

---

[9] Concerning section 859, which speaks of "the use of undue influence in bad faith" (see fn. 2, *ante*), Ramirez insists "the overwhelming evidence shows [she] did not act in bad faith."  Allowing for some redundancy (how can a person exercise undue influence in *good faith*?), the circumstantial evidence is ample that Ramirez was hardly an innocent who wandered onto the scene, but was an active, and knowing, participant in the scheme .

21

trial court mentioned an agreement "that Waltrip had authorization from Moynes to withdraw funds for Moynes's use." Such an agreement as characterized by Ramirez would obviously terminate on Moynes's death, but the trial court was considering withdrawals made thereafter. There being no further need for withdrawals "for Moynes' care and emergency situations," Waltrip and Ramirez were then disqualified for making personal use of the joint accounts.

Section 21350 does not apply to a transfer that "does not exceed the sum of three thousand dollars." (§ 21351, subd. (h).) Ramirez argues that "at least 16 of the transfers the Court charged Mrs. Ramirez for . . . were $3,000 or less," and therefore come within this exemption. Assuming without deciding the estate valuation meets the threshold of section 21351, subdivision (h), it would mean only that these transfers might not be presumptively invalid under section 21350. They would nevertheless be invalid here, as the trial court found: even "disregard[ing] the presumption," there was evidence of undue influence.

## DISPOSITION

The judgment is affirmed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.

22